582 A.2d 1024

CALTON HOMES, INC., APPELLANT, v. COUNCIL ON AFFORD-ABLE HOUSING, STATE OF NEW JERSEY, AND THE TOWNSHIP OF MIDDLETOWN, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 17, 1990—Decided November 19, 1990.

Before Judges SHEBELL, HAVEY and SKILLMAN.

*Thomas Jay Hall* argued the cause for appellant (*Hill, Wallack & Masanoff,* attorneys; *Henry A. Hill* and *Yvonne Marcuse,* on the brief).

*Donald M. Palombi,* Deputy Attorney General, argued the cause for respondent State of New Jersey, Council on Affordable Housing (*Robert J. Del Tufo,* Attorney General, attorney; *Michael R. Clancy,* Assistant Attorney General, of counsel; *Donald M. Palombi* and *Geraldine Callahan,* Deputy Attorney General, on the brief).

Respondent Township of Middletown did not file a brief but relied on the brief submitted by the Council on Affordable Housing.

The opinion of the court was delivered by

SHEBELL, J.A.D.

In this appeal Calton Homes, Inc. (Calton)[1] challenges the substantive rules adopted by the New Jersey Council on Affordable Housing (Council), *N.J.A.C.* 5:92–1.1 *et seq.*, "on two grounds: (a) three of the rules are facially invalid because they conflict with the letter of the [Fair Housing] Act or the legislative intent, and (b) the Substantive Rules as a whole produce an excessive dilution of the municipal obligation that violates the constitutional requirements of *Mount Laurel II.*"

The three targeted rules are: (1) *N.J.A.C.* 5:92–7.1(b) (the "1,000–unit cap rule"), which became effective August 4, 1987; (2) *N.J.A.C.* 5:92–16.1 *et seq.* (the "accessory apartment rule"), which became effective February 16, 1988, and (3) *N.J.A.C.* 5:92–14.4(d) (the "rental credit rule"), which became effective December 15, 1986. Calton alleges that these three rules directly affect its position as a landowner and as a *Mount Laurel* litigant against the Township of Middletown and substantially contribute to the statewide dilution of housing yield under the Fair Housing Act (Act), *N.J.S.A.* 52:27D–301 *et seq.*

On March 31, 1988, Calton filed a notice of appeal from the adoption of the 1,000–unit cap and the accessory apartment rules. Thereafter, Calton filed a motion for leave to amend its notice of appeal to include a challenge to the rental credit rule and a broad-based challenge to the alleged dilutionary effect

---

[1]Calton owns approximately 125 acres of land in the Township of Middletown, Monmouth County, and was the plaintiff in *Mount Laurel II* litigation that was transferred to the Council on Affordable Housing by order dated May 15, 1986. *Calton Homes Inc. v. Township of Middletown,* Docket No. L–073402–84. We were advised at oral argument that the Council had not yet acted on Middletown's petition for substantive certification.

that all of the Council's substantive rules had and would have upon "municipal lower income housing obligations." The motion was granted on August 11, 1988.

## I. BACKGROUND

In *Southern Burlington County NAACP v. Township of Mount Laurel*, 67 *N.J.* 151, 336 *A.*2d 713 (1975), appeal dismissed and *cert. denied*, 423 *U.S.* 808, 96 *S.Ct.* 18, 46 *L.Ed.*2d 28 (1975) (*Mount Laurel I*), our Supreme Court held that Mount Laurel's municipal zoning ordinances violated the "general welfare" provision implicit in Art. I, par. 1 of the state constitution and explicit in the "zoning enabling act," *N.J.S.A.* 40:55–32, by failing to "make realistically possible the opportunity for an appropriate variety and choice of housing for all categories of people who may desire to live there, of course including those of low and moderate income." *Id.* 67 *N.J.* at 187, 336 *A.*2d 713. Every municipality was declared to have an obligation to create a realistic opportunity for the construction of low and moderate income housing "at least to the extent of the municipality's fair share of the present and prospective regional need therefor." 67 *N.J.* at 174, 336 *A.*2d 713.

Eight years later Mount Laurel Township remained "afflicted with a blatantly exclusionary ordinance[;]" *Southern Burlington County NAACP v. Township of Mt. Laurel*, 92 *N.J.* 158, 198, 456 *A.*2d 390 (1983) (*Mount Laurel II*). Therefore, the matter was again brought before the Supreme Court. *Id.* In *Mount Laurel II*, the Court defined in detail a variety of procedures and remedies to effectuate enforcement of each municipality's constitutional obligation. *Id.*

In response, the Legislature passed the Fair Housing Act in 1985. *N.J.S.A.* 52:27D–301 *et seq.* It declared that "every municipality in a growth area has a constitutional obligation to provide through its land use regulations a realistic opportunity for a fair share of its region's present and prospective needs for housing for low and moderate income families." *N.J.S.A.*

52:27D–302(a). The "scheme" created by the Act was designed to satisfy that obligation. *N.J.S.A.* 52:27D–303.

The major feature of the statutory scheme was the creation of the Council on Affordable Housing. *N.J.S.A.* 52:27D–305(a). In addition to other duties, the Council was charged with (1) "[d]etermin[ing] housing regions of the State," (2) "[e]stimat[ing] the present and prospective need for low and moderate income housing at the State and regional levels," and (3) adopting criteria for the determination of each municipality's fair share of that need and for the determination of any adjustments to that share based on environmental and other legitimate planning concerns. *N.J.S.A.* 52:27D–307(a)-(c). Upon execution of these duties, municipalities were to begin the process of petitioning for the Council's "substantive certification." *N.J.S.A.* 52:27D–313. Substantive certification would then be granted if the petitioning municipality's fair share plan and housing element made "the achievement of the municipality's fair share of low and moderate income housing realistically possible." *N.J.S.A.* 52:27D–314(b). A grant of substantive certification protects an approved municipality from any further exclusionary zoning lawsuits for a period of six years. *See N.J.S.A.* 52:27D–313, –317 and –322. In *Hills Development Co. v. Bernards Township*, 103 *N.J.* 1, 510 *A.*2d 621 (1986), the Supreme Court upheld the Act's constitutionality. *Id.* 103 *N.J.* at 25, 510 *A.*2d 621.

On May 18, 1987, the Council proposed the adoption of the current *N.J.A.C.* 5:92–7.1(b) (the "1,000–unit cap"). 19 *N.J.R.* 806(a). The proposal was adopted on July 6, 1987, to be effective August 3, 1987. 19 *N.J.R.* 1431(a). On November 16, 1987, the Council proposed the adoption of the current *N.J.A.C.* 5:92–16.1 *et seq.* (the "accessory apartment rule"). 19 *N.J.R.* 2089(b). It adopted that rule on January 19, 1988, effective February 16, 1988. 20 *N.J.R.* 385(b). On November 7, 1988, the Council limited the availability of the accessory apartment rule to municipalities that had petitioned for substantive certification prior to December 19, 1988. *N.J.A.C.* 5:92–16.6(b); 20

*N.J.R.* 3123(c). On December 15, 1986, the Council adopted the current *N.J.A.C.* 5:92–14.4(d) ("the rental bonus rule").

In order to receive substantive certification, a municipality's housing element and fair share plan must address its "pre-credited need." As demonstrated below, a municipality's pre-credited need represents its allocated share of the region's need for low and moderate income housing after adjustments for the operation of normal market forces and before adjustments for circumstances unique to the municipality. A municipality's pre-credited need is based upon a statistical model and is calculated essentially as follows:

Indigenous Need   The number of substandard housing units occupied by low and moderate income households, but capped in such a way that no municipality's indigenous need shall exceed the region's average. *N.J.A.C.* 5:92–5.2.

  + (add)

Reallocated Present Need   The municipality's share of the excess need of the region. *N.J.A.C.* 5:92–5.4.

  = (equals)

Present Need   The sum of indigenous need and reallocated present need. *N.J.A.C.* 5:92–5.5.

  + (add)

Prospective Need   The municipality's share of the number of low and moderate income households that the region is estimated to need. *N.J.A.C.* 5:92–5.6.

  = (equals)

Total Need   The sum of present and prospective need. *N.J.A.C.* 5:92–5.7.

  + (add)

Demolitions   Number of units of affordable housing expected to be demolished. *N.J.A.C.* 5:92–5.8.

  − (deduct)

Filtering   Number of housing units occupied by middle to upper income households that

| | |
|---|---|
| | will become available to low and moderate income households. *N.J.A.C.* 5:92–5.9. |
| — (deduct) | |
| Residential Conversions | Number of affordable housing units that will be created by the conversion of nonresidential structures or the subdivision of residential structures. *N.J.A.C.* 5:92–5.6. |
| — (deduct) | |
| Spontaneous Rehabilitation | Number of affordable housing units that the operation of the market will create by rehabilitating substandard units. *N.J.A.C.* 5:92–5.11. |
| = (equals) | |
| Pre-credited Need | The sum of total need and demolitions minus reductions for filtering, conversion and spontaneous rehabilitation. *N.J.A.C.* 5:92–5.12. |

Once a municipality's pre-credited need has been calculated, that number is subjected to a variety of credits, caps, and adjustments to arrive at the municipality's fair share number. This fair share number represents the units that a municipality must establish as reasonably likely to be created by its fair share plan. Credits are granted for the number of low and moderate income housing units created between April 1, 1980 and the time of the petition. *N.J.A.C.* 5:92–6.1. Next, a variety of downward adjustments are available to that portion of each municipality's pre-credited need which represents its prospective need and its reallocated present need. *N.J.A.C.* 5:92–8.1. These adjustments are designed to recognize that some municipalities lack developable land sufficient to satisfy their pre-credited need. Adjustments may be granted, for example, for the presence of historically significant sites, *N.J.A.C.* 5:92–8.2(b)(1), environmentally sensitive lands, *N.J.A.C.* 5:92–8.2(b)(3), and land associated with prohibitive infrastructure costs. *N.J.A.C.*

5:92–8.5. Thus, the pre-credited need may be further reduced by the following:

| Credit for Units Created since 4/1/80–1/1/87 | N.J.S.A. N.J.A.C. | 52:27D–307(c)(1); 5:92–6.1 |
| Adjustments for Lack of Developable Land | N.J.S.A. N.J.A.C. | 52:27D–307(c)(2); 5:92–8.1 to –8.6. |

Two caps may further reduce a municipality's fair share; specifically, every municipality's fair share is capped at twenty percent of its occupied housing stock or 1,000 units, whichever is less. *N.J.A.C.* 5:92–7.1.

Application of these credits, adjustments and caps results in the determination of the number of units to be created by the municipalities' fair share plan. There are several ways that units can be created to satisfy a fair share. The plan can provide zoning for the construction of new units of affordable housing. A petition for substantive certification, filed prior to December 19, 1988, may also provide zoning for the creation of accessory apartment units, which are essentially self-contained residential units created within an already existing residential structure. *N.J.A.C.* 5:92–16.1 *et seq.* A municipality receives one credit for each unit of owner-occupied housing that its fair share plan makes realistically possible, and it receives one and one-third credits for each unit of rental housing that its plan makes realistically possible. *N.J.A.C.* 5:92–14.4(d). There is no mechanism for the reallocation of units that are eliminated from a municipality's pre-credited need through the application of credits, adjustments and caps.

## II.

### A. THE 1,000–UNIT CAP

*N.J.S.A.* 52:27D–307(c)(2)(b) directs the Council to adopt guidelines for the adjustment of municipal fair shares whenever "[t]he established pattern of development in the community

would be drastically altered." *N.J.S.A.* 52:27D–307(e) empowers the Council, "in its discretion," to

place a limit, based on a percentage of existing housing stock in a municipality and any other criteria including employment opportunities which the council deems appropriate, upon the aggregate number of units which may be allocated to a municipality as its fair share of the region's present and prospective need for low and moderate income housing.

The Council adopted *N.J.A.C.* 5:92–7.1, which provides:

(a) After receiving the crediting provided in Subchapter 6, Credits, where a municipality's present and prospective fair share exceeds 20 percent of its total occupied housing stock as estimated as of July 1, 1987, the municipality may adjust its fair share to 20 percent of its estimated 1987 occupied housing stock.

(b) After receiving the crediting provided in *N.J.A.C.* 5:92–6, Credits, where a municipality's present and prospective fair share exceeds 1,000 low and moderate income housing units, the municipality may adjust its fair share to 1,000.

Appellant does not seek to invalidate the twenty percent cap set forth in *N.J.A.C.* 5:92–7.1(a). It does, however, challenge the 1,000–unit cap set forth in *N.J.A.C.* 5:92–7.1(b) on the grounds that it is in violation of the statutory mandate that any "limit" be based upon "criteria," and is unjustified by the "radical transformation" doctrine. Calton urges that the 1,000–unit figure is arbitrary and unreasonable because it is an absolute figure that need not relate to the housing capacity of any given municipality.

The Council argues that the 1,000–unit cap is valid because it is reasonable to conclude that the construction of 1,000 units of affordable housing, with its likely accompaniment of many thousands of other housing units, would "drastically alter" and "radically transform" most municipalities. The Council maintains that the criteria used to set the 1,000–unit cap are the "drastic alteration" and "sound planning concepts" criteria expressly set forth in the Act.

It is clear that pursuant to *N.J.S.A.* 52:27D–307(e) the Council may legitimately act to prevent the drastic alteration of a municipality. There is a strong presumption in favor of the Council's choice of means to attain that end. *Cf. Emmer v. Merin*, 233 *N.J.Super.* 568, 581, 559 *A.*2d 845 (App.Div.), *certif. denied*, 118 *N.J.* 181, 570 *A.*2d 950 (1989); *In re NJPDES*

*Permit No. NJ 0055247,* 216 *N.J.Super.* 1, 11, 522 *A.*2d 1002 (App.Div.), *certif. denied,* 108 *N.J.* 185, 527 *A.*2d 1390 (1987). The Council's reasoning, however, that the 1,000–unit cap is based upon "criteria" as required by *N.J.S.A.* 52:27D–307(e) is without support. The Council seeks to establish and justify the 1,000–unit cap number as both the measure and the criteria. The Council may not simply designate a fixed number of units to be built as a maximum in all municipalities and without basis conclude it is a reasonable number in all cases. By granting the Council the power to base its fair share limits upon any criteria "which the [C]ouncil deems appropriate," *N.J.S.A.* 52:27D–307(e), the Legislature could not have intended to convey unbridled discretion to select an absolute cap on the number of units to be built without first considering the burden imposed on the petitioning municipality and its relationship to other municipalities sharing the burden of providing regional and statewide housing needs. *See generally Mount Laurel II,* 92 *N.J.* at 219, 456 *A.*2d 390.

The Supreme Court in upholding the constitutionality of the Act was careful to limit its holding to the Act's facial constitutionality and to retain for the judiciary the right to further review the question of whether the Act, in practice, failed to satisfy the constitutional obligations described in *Mount Laurel II. Hills Development,* 103 *N.J.* at 25, 510 *A.*2d 621; *see also Morris County Fair Housing Council v. Boonton Tp.,* 209 *N.J.Super.* 393, 427–30, 507 *A.*2d 768 (Law Div.1985), aff'd in part, rev'd in part on other grounds *sub nom. Hills Dev. Co. v. Bernards Tp.,* 103 *N.J.* 1, 510 *A.*2d 621 (1986). Thus, this court must determine whether the 1,000–unit cap adopted by the Council complies with the Act and, even if it does, whether it will operate to continue a violation of a municipality's constitutional obligation as established by the *Mount Laurel* decisions.

In *Mount Laurel II,* the Supreme Court held that trial courts could relieve a municipality of its duty to immediately satisfy its present need in a situation where the construction of the

requisite housing would be in "such quantity as would radically transform the municipality overnight." 92 *N.J.* at 219, 456 *A.*2d 390. The relief was to be granted "sparingly" and would consist only of allowing the qualifying municipality to phase in the requisite housing "over a period of years." *Id.* The Supreme Court's opinion contemplated that relief should be made available only after a consideration of circumstances surrounding a given municipality. *Id.* It is true that *Mount Laurel II* was designed to provide a mechanism for *judicial* enforcement of the constitutional obligations defined in that case. The Legislature's enactment of the Fair Housing Act, and the Supreme Court's willingness to defer to the Legislature's choice of mechanisms to be used to satisfy the constitutional obligations did not, however, result in an abdication of the judiciary's obligation to review the reasonableness and constitutionality of the Council's actions. *See, e.g., Hills Development,* 103 *N.J.* at 41, 510 *A.*2d 621.

The power of the Council must find its origin in the Act; its own regulations or administrative action cannot alter or enlarge the statutory mandate. *See Abelson's Inc. v. New Jersey State Bd. of Optometrists,* 5 *N.J.* 412, 424, 75 *A.*2d 867 (1950). In the final analysis, it is the court's function to interpret the enabling statute to determine whether the agency's actions are consistent with the policy established by the Legislature or exceed the scope of the agency's jurisdiction. *See Mayflower Securities Co., Inc. v. Bureau of Securities,* 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973); *Swede v. Clifton,* 22 *N.J.* 303, 312, 125 *A.*2d 865 (1956).

Under the principles established by the Supreme Court in *Mount Laurel II,* relief may be granted when the municipality carries the burden of demonstrating mitigating or extenuating circumstances which rise to the level of a "radical transformation." 92 *N.J.* at 219, 456 *A.*2d 390. It is clear, however, that our Supreme Court envisioned that under a judicially supervised plan, when the danger of radical transformation exists, the "[t]rial courts should have the discretion, under those circumstances, to moderate the impact of such housing by

allowing even the present need to be phased in over a period of years." *Id.*

The Legislature's adoption of the Act, while substituting administrative agency action for judicial supervision, nonetheless sought to protect against drastic alteration of the established pattern of development in a community. *N.J.S.A.* 52:27D–307(c)(2)(b). That objective, however, must be considered in light of the Legislature's intent that *Mount Laurel II*'s constitutional mandates be effectuated. *N.J.S.A.* 52:27D–302(a), 303. *See Hills Dev. Co. v. Bernards Tp.*, 103 *N.J.* at 41, 510 *A.*2d 621; *Morris County Fair Housing Council v. Boonton Tp.*, 209 *N.J.Super.* at 429, 507 *A.*2d 768.

Initially, the Council adopted *N.J.A.C.* 5:92–7.1, which established a post-credit fair share "cap" of twenty percent of each municipality's 1987 occupied housing stock. The Council then amended the regulation to add subsection (b), which provides that "[a]fter receiving the crediting provided in *N.J.A.C.* 5:92–6, Credits, where a municipality's present and prospective fair share exceeds 1,000 low and moderate income housing units, the municipality may adjust its fair share to 1,000." *See* 19 *N.J.R.* 1431 (August 3, 1987).

The Council's determination that a fair share number exceeding 1,000 will *per se* constitute a drastic alteration of the established pattern of development in all New Jersey municipalities is arbitrary and unreasonable. The Council's assertion that the 1,000–unit cap figure is not arbitrary but rather was taken directly from the Fair Housing Act is untenable. The Legislature, in enacting *N.J.S.A.* 52:27D–323(e), found that it was appropriate for a municipality which had a fair share obligation of between 500 and 999 low and moderate income units in inclusionary developments to have up to six years to phase in final approvals for those inclusionary developments. It is obvious from a full reading of that provision that the Legislature contemplated that certain municipalities may have a fair share obligation more than double the 1,000–unit cap estab-

lished by the Council's regulations. The 1,000–unit cap which the Council adopted, *N.J.A.C.* 5:92–7.1(b), is applicable to a municipality's fair share obligation and not inclusionary developments to which the Legislature addressed itself in *N.J.S.A.* 52:27D–323(e). The Council argues that, regardless of whether the units are inclusionary, it will nonetheless "impose a great financial burden on a municipality." This we do not doubt; however, the burden is less onerous if shared by all in accordance with a justifiable standard.

The Council fails to sufficiently counter Calton's showing of the inequity caused by the 1,000–unit cap. We here set forth verbatim a portion of appellant's brief, which the Council does not dispute, describing the application of the 1,000–unit cap to Middletown Township, Monmouth County, to demonstrate the consequences of the application of the cap:

Middletown's pre-credited fair share, as calculated by COAH, was 1,850 units. When COAH adopted the 1,000–unit "cap," *N.J.A.C.* 5:92–7.1(b), Middletown's obligation was reduced to 1,000 units. As seen in [the table], the 1,000–unit cap constituted a windfall to Middletown when compared to other municipalities in Monmouth County.

Table 2

COAH PRE–CREDITED OBLIGATION AS PERCENTAGE OF 1987 HOUSE-HOLD BASE (MONMOUTH COUNTY)

| Municipality | COAH Pre-capped Pre-Credited Obligation | COAH Pre-Credited Obligation | 1987 Households Base | COAH Obligation Base-% |
|---|---|---|---|---|
| Aberdeen Township | · | 331 | 6,219 | 5.3 |
| Allenhurst Borough | | 23 | · 337 | 6.8 |
| Allentown Borough | | 0 | 690 | 0 |
| Asbury Park City | | 0 | 7,262 | 0 |
| Atlantic Highlands Borough | | 131 | 1,867 | 7.0 |
| Avon–By–The–Sea Borough | | 23 | 1,024 | 2.2 |
| Belmar Borough | | 64 | 3,132 | 2.0 |
| Bradley Beach Borough | | 0 | 2,206 | 0 |
| Brielle Borough | | 169 | 1,753 | 9.6 |
| Colts Neck Township | | 197 | 2,545 | 7.7 |

| Municipality | COAH Pre–capped Pre–Credited Obligation | COAH Pre–Credited Obligation | 1987 Households Base | COAH Obligation Base–% |
|---|---|---|---|---|
| Deal Borough | | 49 | 683 | 7.2 |
| Eatontown Borough | | 572 | 5,332 | 10.7 |
| Englishtown Borough | | 76 | 470 | 16.2 |
| Fair Haven Borough | | 154 | 1,971 | 7.8 |
| Farmingdale Borough | | 0 | 531 | 0 |
| Freehold Borough | | 261 | 3,715 | 7.0 |
| Freehold Township | | 937 | 7,030 | 13.3 |
| Hazlet Township | | 563 | 7,175 | 7.8 |
| Highlands Borough | | 65 | 2,378 | 2.7 |
| Holmdel Township | | 642 | 3,211 | 20.0 |
| Howell Township | | 890 | 11,205 | 7.9 |
| Interlaken Borough | | 19 | 396 | 4.8 |
| Keansburg Borough | | 45 | 3,516 | 1.3 |
| Keyport Borough | | 0 | 3,122 | 0 |
| Little Silver Borough | | 214 | 1,948 | 11.0 |
| Loch Arbour Village | | 5 | 127 | 3.9 |
| Long Branch City | | 0 | 12,506 | 0 |
| Manalapan Township | | 445 | 7,636 | 5.8 |
| Manasquan Borough | | 224 | 2,256 | 9.9 |
| Marlboro Township | | 883 | 8,377 | 10.5 |
| Matawan Borough | | 186 | 3,183 | 5.8 |
| Middletown Township | 1,850 | 1,000 | 23,133 | 4.3 |
| Millstone Township | | 11 | 1,410 | 0.8 |
| Monmouth Beach Borough | | 51 | 1,511 | 3.4 |
| Neptune Township | | 46 | 10,704 | 0.4 |
| Neptune City Borough | | 27 | 2,267 | 1.2 |
| Ocean Township | 1,298 | 1,000 | 9,213 | 10.9 |
| Oceanport Borough | | 136 | 2,113 | 6.4 |
| Red Bank Borough | | 589 | 5,004 | 11.8 |
| Roosevelt Borough | | 2 | 325 | 0.6 |
| Rumson Borough | | 268 | 2,626 | 10.2 |
| Sea Bright Borough | | 67 | 1,116 | 6.0 |
| Sea Girt Borough | | 77 | 1,056 | 7.3 |
| Shrewsbury Borough | | 219 | 1,097 | 20.0 |
| Shrewsbury Township | | 15 | 556 | 2.7 |
| South Belmar Borough | | 25 | 683 | 3.7 |
| Spring Lake Borough | | 145 | 1,575 | 9.2 |
| Spring Lake Hts. Borough | | 87 | 2,782 | 3.1 |
| Tinton Falls Borough | | 590 | 3,296 | 17.9 |
| Union Beach Borough | | 100 | 2,126 | 4.7 |
| Upper Freehold Township | | 0 | 1,051 | 0 |
| Wall Township | | 865 | 7,350 | 11.8 |
| West Long Branch Borough | | 281 | 2,538 | 11.1 |
| Monmouth County | 13,920 | 12,772 | 197,335 | 6.5 (County Average) |

. . . .

In 1987, Middletown Township's total of 23,133 households accounted for 11.7 percent of the county's total, or about one out of every nine households in the county. Middletown's pre-capped obligation of 1,850 units represented 13.3 percent of Monmouth County's aggregate pre-capped obligation of 13,920 units. Because of the 1,000–unit "cap," however, Middletown's obligation dropped to only 7.8 percent of the county's capped total of 12,772 units.

COAH's original fair share calculation for Middletown, 1,850 housing units, represents 8.0 percent of the Township's 23,133 occupied households. Table 2 shows that Middletown's original obligation (8.0 percent of the Township's total households) was less than that of 16 other municipalities in Monmouth County, whose *Mt. Laurel* obligations range from 9.2 percent to 20.0 percent of their 1987 household bases. With the subsequent "cap" at 1,000 units, Middletown's proportionate share dropped from 8.0 percent to 4.3 percent of its 1987 household base and is now below the proportionate shares in 31 of the county's municipalities.

Other inequities are apparent in comparing Middletown with other Monmouth County municipalities. As a result of the 1,000–unit "cap," Middletown's fair share of 1,000 units is only slightly higher than that of Freehold Township (937 units) although Middletown has 3.3 times more households than Freehold to share the obligation. As indicated in Table 2, every other municipality in Monmouth County with a *Mt. Laurel* obligation of 500 or more units has a proportionate share considerably above that of Middletown. In most cases, the proportionate obligation is more than double Middletown's 4.3 percent share. Among municipalities having 5,000 or more households and a nonzero COAH obligation, Middletown has the second lowest percentage obligation.

We are unable to sustain the 1,000–unit cap as a reasonable exercise of the Council's authority under the Act. Its application substantially exacerbates disparity in the obligation imposed on various municipalities in the same region and, therefore, clearly demonstrates that the cap is unreasonable. The Legislature could not have intended that, under the guise of protecting against a drastic alteration in one municipality, other municipalities would be left in so disparate a position. While it can be argued that no immediate financial consequence falls upon the other municipalities because the excess fair share obligation of the capped municipality is not shifted to other municipalities, it is nonetheless a fact of life that those other municipalities who do their full share have a right to expect that other municipalities will be required to do their part as well. *See Mount Laurel II,* 92 *N.J.* at 219, 456 *A.*2d 390.

## B. THE ACCESSORY APARTMENT RULE

*N.J.A.C.* 5:92–16.1 allows a municipality to include "zoning for the creation of affordable accessory apartment units" as part of its housing element. Calton claims that *N.J.A.C.* 5:92–16.1 *et seq.* ("the accessory apartment rule") is invalid because, in the absence of other incentives, zoning for the creation of affordable accessory apartments does not provide a "realistic opportunity" for the actual creation of those units. The Council's response is that Calton has failed to establish the factual accuracy of its position, and that, even if true, *N.J.A.C.* 5:92–16.5 cures the defect by requiring municipalities to implement alternate methods of satisfying their fair share if their zoning does not in fact result in the creation of accessory apartments.

*N.J.S.A.* 52:27D–311(a) provides in part:

a. In adopting its housing element, the municipality may provide for its fair share of low and moderate income housing by means of any technique or combination of techniques which provide a realistic opportunity for the provision of the fair share. The housing element shall contain an analysis demonstrating that it will provide such a realistic opportunity, and the municipality shall establish that its land use and other relevant ordinances have been revised to incorporate the provisions for low and moderate income housing.

The substantive regulations define an accessory apartment as

a self-contained residential dwelling unit containing its own kitchen, sanitary facilities, and private entrance, which is created within an existing home, or through the conversion of an existing accessory building on the same site, or by addition to an existing home or accessory building. [*N.J.A.C.* 5:92–16.1(b)].

A municipality can satisfy all or a portion of its fair share by zoning for the creation of accessory apartments in up to three percent of the municipality's dwelling units which are of "sufficient size and character ... so as to permit conversion to an accessory apartment." *N.J.A.C.* 5:92–16.2. In addition to allowing creation of the apartments, the municipality must impose affordability controls on the apartments created, promote the creation of the apartments, and require that they be "affirmatively marketed." *N.J.A.C.* 5:19–16.4 to *N.J.A.C.* 5:19–16.-5; *see also N.J.A.C.* 5:19–15.2.

The statement accompanying the Council's proposal of the accessory apartment rule stated that because "of the limited literature" on this topic it was impossible "to know how many property owners would actually be interested in this program." It therefore proposed the rule only as a "pilot program." 19 *N.J.R.* 2089(b). That pilot program was later limited to communities that petitioned for certification prior to December 19, 1988. *N.J.A.C.* 5:92–16.6. The Council determined that municipalities were "placing too great an emphasis" on the as yet unproven accessory apartment theory. 20 *N.J.R.* 1673(b).

We are not in a position to take judicial notice of what will and what will not result in the creation of housing units. It is not sufficient for Calton to merely allege that accessory apartments will not be created. *See Bergen Pines Hosp. v. Department of Human Servs.*, 96 *N.J.* 456, 477, 476 *A.*2d 784 (1984) (challenger bears burden of establishing that rule is irrational). Calton's brief cites one study in support of its argument. That study suggests only that homeowners will not create accessory apartments unless they receive a "substantial benefit." There is nothing to suggest, however, that the rental a homeowner will receive does not constitute "a substantial benefit" to a particular homeowner. We are unable to conclude that the Council's accessory apartment scheme will not cause even three percent of eligible homeowners to create accessory apartments. We must therefore defer to the Council's determination that its plan might accomplish such a result. *Van Dalen v. Washington Tp.*, 120 *N.J.* 234, 246, 576 *A.*2d 819 (1990), *citing Newark Firemen's Mut. Benev. Ass'n v. Newark*, 90 *N.J.* 44, 55, 447 *A.*2d 130 (1982) ("[d]eference to an administrative agency is particularly appropriate where ... new and innovative legislation is being put into practice").

Further, as the Council points out, *N.J.A.C.* 5:92–16.5 provides an adequate safeguard for the accessory apartment rule. That regulation ensures that if the projected number of accessory apartments are not built within two years, the certified municipality must provide an alternative method of fulfilling its

obligation. *N.J.A.C.* 5:92–16.5(c). Thus, even if Calton is right and no accessory apartments are ever created, the need for those units will be satisfied through other means. Calton has failed to sustain its burden of proving that the accessory apartment rule is invalid.

## C. THE RENTAL BONUS RULE

*N.J.A.C.* 5:92–14.4(d) provides as follows:

> (d) All municipalities, including those not required to develop a rental housing component, shall receive a one and a third unit credit, for each rental unit constructed and occupied in their municipality, until such time that the constructed rental housing units are in excess of 20 percent of the municipal fair share calculated after crediting, after adjustments and after indigenous need. The Council may grant municipalities the one and a third unit credit when it determines that the municipality has provided or received a firm commitment for the construction of low and moderate income rental units that includes a construction timetable coinciding with the period of substantive certification.

Calton contends that this regulation is invalid because (1) it is contrary to *N.J.S.A.* 52:27D–307(c)(1); (2) it is otherwise *ultra vires;* and (3) it irrationally awards the bonus before the rental unit is even built. The Council responds that (1) *N.J.S.A.* 52:27D–307(c)(1) simply does not apply to *N.J.A.C.* 5:92–14.4 or to the subject of that regulation; (2) the bonus is consistent with the statutory mandate to provide a realistic opportunity for the construction of a "variety" of housing; (3) the entire regulatory scheme, including the rental bonus, is the most effective means to encourage the construction of rental housing; and (4) very few units are actually lost.

*N.J.S.A.* 52:27D–307(c)(1) provides:

> Municipal fair share shall be determined after crediting on a one-to-one basis each current unit of low and moderate income housing of adequate standard, including any such housing constructed or acquired as part of a housing program specifically intended to provide housing for low and moderate income households[.]

Calton maintains that the statute permits crediting only on a one-to-one basis and only for units already constructed and occupied at the time of the petition for substantive certification, while the regulation provides for crediting for rental units on a

one to one-and-one-third basis for units that are only in the planning stage.

*N.J.S.A.* 52:27D–307(c)(1) is relevant only to the determination of a municipality's pre-credited need; the rental bonus rule is relevant to the issue of how the municipality can satisfy that need. The purpose of granting credits pursuant to *N.J.S.A.* 52:27D–307(c)(1) is to avoid penalizing municipalities that allowed for the construction of affordable housing prior to petitioning the Council for substantive certification. *See Bernards Tp. v. Department of Community Affairs,* 233 *N.J.Super.* 1, 14, 558 *A.*2d 1 (App.Div.1989), *certif. denied,* 118 *N.J.* 195, 570 *A.*2d 959 (1989). *N.J.A.C.* 5:92–6.1 limits credits to units created or rehabilitated after April 1, 1980.

The rental bonus rule is part of a comprehensive scheme to encourage municipalities and developers to build affordable rental units in the future. Although the Council used the word "credit" in the context of the rental bonus rule, it is not the type of "credit" to which *N.J.S.A.* 52:27D–307(c)(1) refers.

Calton also claims that the rental bonus credit has no statutory authorization. The Council's response is that the credit is implicitly authorized by *N.J.S.A.* 52:27D–302(h). This provision incorporates *Mount Laurel I*'s requirement that each municipality provide a realistic opportunity for the construction of a "variety" of housing. *Mount Laurel I* recognized the need for the construction of a variety of housing, including rental housing for those in "[l]arge families who cannot afford to buy large houses and must live in cheaper rental accommodations." *Mount Laurel I,* 67 *N.J.* at 171, 336 *A.*2d 713.

The rental bonus rule is part of a scheme to encourage construction of rental housing. On its face, the scheme appears to be a rational means to accomplish the construction of affordable rental housing. The scheme has three basic components: (1) a requirement that a municipality with a significant fair share number satisfy twenty percent of that number with rental housing, *N.J.A.C.* 5:92–14.4(a) and (b); (2) an incentive to

encourage developers to construct rental housing, which incentive consists of reducing the presumptive maximum set aside for affordable units from twenty percent to fifteen percent and increasing the presumptive density from six units per acre to 7.8 units per acre, *compare N.J.A.C.* 5:92–8.4(c) to *N.J.A.C.* 5:92–14.4(c); and (3) an incentive (*i.e.,* the rental bonus) to encourage municipalities to provide for rental units, despite the increased density of construction that will take place in connection therewith. *N.J.A.C.* 5:92–14.4(d). *See* 18 *N.J.R.* 2442(a) (discussing reasons for adoption of rental housing program).

The Council is granted wide discretion in determining how to carry out the essential purpose of the Act, which is the creation of a variety of affordable housing, including rental housing. *N.J.S.A.* 52:27D–307(c)(2); *N.J.S.A.* 52:27D–310 to –311. Because the rental bonus is a reasonable component of a scheme reasonably designed to serve the Legislature's purpose it should be sustained.

We reject the contention that it is irrational to grant the bonus credit until the affordable rental unit is actually occupied. The Council grants the bonus credit only after it is shown a "firm commitment" from a developer and a "timetable" for the construction of the unit. At that point, it is reasonable to conclude that the unit will in fact be built and therefore to grant the credit. Further, if the unit is not actually built, the credit, including its bonus portion, will be withdrawn; consequently, the municipality will have to take other steps to replace the lost units. Although there may be delay in this process, courts should not unduly impose strict timetables upon the Council's attempts to carry out is duties. *Hills Dev. Co. v. Bernards Tp.,* 103 *N.J.* at 40–42, 510 *A.*2d 621.

## III. DILUTIONARY EFFECT

Calton's position is that the Council's adoption of substantive regulations allowing various credits, caps, and adjustments to reduce each municipality's "total need" for affordable

housing, without the reallocation of the eliminated units, renders it impossible for the substantive certification process to establish a realistic opportunity for the creation of the number of affordable units that the Council itself has determined that the state requires. The Council responds that neither the Act nor the constitution require that it provide an opportunity for the construction of any particular number of units, and that the application of the credits, caps, and adjustments do not significantly reduce the number of units that will be created.

The first point of Calton's asserted "dilutionary effect" attack is upon the Council's utilization of the filtering rule in permitting adjustment of the affordable housing figure for market forces. *N.J.A.C.* 5:92–5.9. Calton contends that the filtering rule is arbitrary because housing does not filter down from the middle or upper classes to the lower classes in suburban municipalities. Calton has not only failed to properly raise the filtering issue in its notice of appeal or case information statement, but has also failed to prove the position it asserts. *See Bergen Pines Hosp. v. Department of Human Servs.*, 96 *N.J.* at 477, 476 *A.2d* 784. Calton's assertion that filtering does not occur in suburbs because "condominiums and townhouses in the suburbs can be expected to appreciate in resale value and apartment rents can be expected to increase" is without support in the record. We are unable to conclude that the Council's premise that housing does filter to the lower classes is unreasonable. The mere fact that others disagree with the Council's conclusion that filtering takes place does not require its reversal. The Council should be given sufficient time to test the validity of its theories in this regard. As stated in *Van Dalen v. Washington Tp.*, 120 *N.J.* at 234, 576 *A.2d* 819, "[b]ecause the legislative scheme is novel, the implementation of its goals is necessarily an evolving process. Accordingly, COAH is entitled to a reasonable degree of latitude, consistent with the legislative purpose, in its effort to ascertain which planning and statistical studies best serve the long-term statutory objectives."

Calton attacks the alleged dilutionary impact of the credits allowed by *N.J.S.A.* 52:27D–307(c)(1), which as implemented by *N.J.A.C.* 5:92–6.1, provides in pertinent part that those housing units created or rehabilitated after April 1, 1980 will be credited against a municipality's present and prospective fair share.

The Council determined present need through the use of the 1980 census. *Bernards Tp. v. Department of Community Affairs*, 233 *N.J.Super.* at 10, 558 *A.*2d 1; *N.J.A.C.* 5:92 app. at 40–43. Specifically, present need represents the number of low and moderate income families living in substandard units in 1980 ("projected" to 1987). *Id.* Thus, any affordable units created after April 1, 1980, but before a municipality petitioned for substantive certification, will actually be available housing for families which was not available prior to April 1, 1980. Therefore, a municipality that receives credit has not escaped its obligation; rather, it has already satisfied that portion of its obligation.

Calton also attacks the use of the twenty percent cap and the 1,000–unit cap because this reduction is not reallocated. According to Calton, application of the twenty percent cap results in the elimination of 1,482 units, and application of the 1,000–unit cap would have eliminated 23,008 units, for a total of 24,430 units eliminated from the total need of 199,666 units. We have, however, struck down the 1,000–unit cap. Therefore, only the consequences of the twenty percent cap, alleged to be 1,482 units, need be considered.

The Council admits that the caps do operate so as "to limit the amount of housing units certain municipalities may be required to provide." However, it defends the caps on the ground that they are consistent with *N.J.S.A.* 52:27D–307(e) and *N.J.S.A.* 52:27D–307(c)(2)(b) in that they prevent the drastic alteration of a municipality trying to satisfy its *Mount Laurel* obligation. We are satisfied that, with the elimination of the 1,000–unit cap, any dilutionary effect of the twenty percent cap

is of such small proportions as to not unreasonably interfere with the Act's overall purposes.

Calton challenges the adjustments provided for in *N.J.A.C.* 5:92–8.1 to 92–8.6. These allow a municipality to reduce the reallocated and prospective portions of its fair share number by demonstrating that it lacks sufficient developable land to satisfy those portions of the number. Land can be deemed undevelopable for a variety of reasons, including its special environmental or historic significance, *N.J.A.C.* 5:92–8.2, or its lack of infrastructure capacity. *N.J.A.C.* 5:92–8.5. Calton argues that if the adjustments are to be granted, the units thereby eliminated must be reallocated elsewhere in the region. The Council notes that "[s]uch reassignment would be difficult to do fairly, and impossible if some of the regional municipalities were already certified ... [and would] make some municipalities provide for more than their fair share...."

The Council's contentions as to the impracticability and unfairness of reallocation are convincing. In *Van Dalen v. Washington Tp.*, 120 *N.J.* at 246–47, 576 *A.*2d 819, the Supreme Court affirmed the Council's refusal to allow parties to attempt to prove that specific municipalities contain growth areas different than those demarcated in the State Development Guide Plan. The Court was willing to defer to the Council's choice of "easy administration and stability in the planning process" over "greater precision." *Id.* at 246, 576 *A.*2d 819. We likewise defer to the Council's position on this issue as it has not been demonstrated that the Council's position is unreasonable or that sufficient dilution of the goal of the Act will occur as to warrant judicial intervention at this time. Calton has failed to demonstrate that the effect of the application of the adjustments is substantial enough to justify reallocation. Most adjustments eliminate only specific parcels of land. Therefore, the adjustments effect fair share numbers only when the municipality has no other land available for development.

■ Calton also attacks the rental bonus rule, *N.J.A.C.* 5:92–14.4(d), because it operates to grant a municipality credit for one-and-a-third units of affordable housing whereas only one unit of affordable rental housing will be built. Thus, a municipality can, for example, satisfy forty of its fair share units by building thirty units of rental housing. We have concluded earlier in this opinion that the grant of the bonus is not *ultra vires* or arbitrary. We now conclude that it is not arbitrary to eliminate the bonus units without reallocating them. The worthy purposes of the rental bonus rule outweigh the limited shortfall that may result.

Lastly, Calton attacks the Council's practice related to the adjustment of "covered employment." "Covered employment" is a factor used in determining a municipality's "present need;" the greater the covered employment, the greater the present need. For the purpose of determining covered employment, an employer is considered to be located in a municipality if its postal address places it there. The Council allows municipalities to reduce their present need by demonstrating that an employer with a postal address in the municipality is in fact located outside the municipality. Calton alleges that the Council does not allow an objector to increase a municipality's present need by demonstrating that an employer with a postal address outside the municipality is in fact located within it. This, Calton contends, results in the elimination, without reallocation, of fair share units.

The Council represents, however, that its practice is to allow "covered employment" to be adjusted both downwards and upwards, thus creating a situation in which there is neither a net loss nor a net gain in fair share units on a statewide basis. Calton has failed to disprove this assertion, and therefore, its attack must fail.

In conclusion, we hold that the 1,000–unit cap rule is invalid and may not be used to adjust a municipal fair share obligation.

We affirm those remaining actions of the Council forming the subject matter of this appeal.