[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I.
Introduction and Factual Background
This action concerns an appeal by the plaintiffs, Joseph and Stanley Wisniowski (hereinafter, the "applicants" or the "developers") from the decision of the defendant, the Berlin Planning Commission (hereinafter, the "Commission") denying their November 1, 1991 application for a 32 lot single family home subdivision, known as Arbor Commons, on a 14.5 acre parcel of land in Berlin, Connecticut. The parcel is located on the easterly side of Kensington Road and abuts the railroad on the east, a parcel owned by the Connecticut Light and Power Company on the south and the Colonial Village subdivision on the southwest. It is presently zoned R-43 which requires one-acre (42,000 square feet) lots. In the present proposal the average lot size in the development would be reduced CT Page 5044 to 13,000 square feet with individual lots ranging from 8,000 square feet to 23,000 square feet. The application was submitted as an affordable housing project pursuant to General Statutes 8-30g in which certain lots would be designated as affordable under the statute.[1]
The developers proposed five different styles of homes with two styles, "Freeport" and "Boothbay", utilized for the affordable units (as well as for regularly prices units). (Return Item QQ).[2]
On December 10, 1991, the Commission held a public hearing on the subdivision application. (Return Item D). The developers' attorney, Thomas DeMille, noted that Berlin had 6327 housing units of which 179 or 2.8% were deemed statutorily affordable. He indicated that seven of the proposed thirty two units would be deed restricted for twenty years and provide that the occupants would pay no more than 30% of their income. He indicated that according to information from the Connecticut Housing Authority,[3] the mean income for Berlin's statistical unit was $42,600.00 which at 80%, would result in $34,000.00 annual income of which 30% or $10,200.00 could be used for housing costs.
The developers' engineer, Mr. Hewitt, discussed the general layout of the project, noting that the lot size, bulk and general dimensional standards for the development were based on the requirements of the R-7 zone. Further, he indicated that the project would be served by public sewers and public water. Storm water would be managed so that it would result in a zero increase to Crooked Brook. The roads would be designed to town standards. He also discussed a traffic report prepared by Cambridge Analytics which indicated that the sight distance of 600 feet to the south met the required 285 feet and the 260 feet to the north satisfied the 195 foot requirement. The report also discussed widening, alignment and traffic control measures. (Return Item X).
Mr. Alan Viets, a landscape architect, commented that the goal of the proposal was to create a "New England" village with a cluster design concept to maintain open spaces.
Dr. John Raabe of Geological Services, Inc. discussed the project's impact on nearby water resources. He performed a lengthy study on the nearby aquifer and concluded CT Page 5045 that as the subdivision and its resulting drainage would be downgradient, it would have no impact. (Return Item A).
After an extensive discussion with Dr. Raabe, the Commission received comments from the public and further discussed the application with Mr. DeMille. Commissioner Kern was curious about the applicants' intention to not finish the upstairs of the affordable units.
The public hearing was continued to January 14, 1992. (Return Item Q). Mr. Voelker, the Town Planner, read into the record a letter from the Board of Police Commissioners on the proposed intersection, a letter from James Okrongly of the Department of Health Services on the potential impact on the water supply and a letter from the Town Attorney. The Commission discussed a number of issues with the developers including the affordability restrictions, slopes and retaining walls, the cost of the units, and runoff and the retention ponds. Mr. Raabe was asked additional questions about hydrology issues. The public hearing was then continued to February 5, 1992, at which time Mr. Hewitt reported the developers' agreement with the Board of Police Commissioner's proposal to realign the intersection, that the number of lots was reduced to thirty with six proposed as affordable and reviewed the revisions to the drainage system. Attorney Larry Fagan, representing about eighteen neighbors, presented a memorandum in opposition to the project. He also called upon Thomas Ringrose, an appraiser, who indicated that an R-21 lot was worth $65,000.00 but an R-43 lot was worth $80,000.00.
Members of the public again asked questions and commented on the application concerning violations of the zoning regulations, the unfinished second floor, and traffic. One individual read a letter covering issues raised in the earlier hearings. After a final discussion on the affordable housing statute, the hearing was closed.
On March 3, 1992, the Berlin Inland Wetlands Commission approved its coordinate application. (Return Item BB). on April 14, 1992, the Commission denied the developers' subdivision application stating nine reasons. (Return Item KK). Notice of the denial was published on April 20, 1992. On or about April 24, 1992, the developers filed an appeal from the denial pursuant to the Act. The trial was held on March 10, 1993. CT Page 5046
 II.
Discussion
 A.
In TCR New Canaan, Inc. v. Planning and Zoning Commission of the Town of Trumbull, 6 Conn. L. Rptr. No. 4, 91 (March 5, 1992) (hereinafter, "TCR"), this court reviewed the test for aggrievement under 8-30g(b). That analysis is applicable to this case. Essentially the statute states that:
 [a]ny person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units . . . may appeal such decision pursuant to the procedures of this section.
In this case, the plaintiffs alleged that they own the subject property and the Commission admitted this in its answer. Certainly under traditional aggrievement rules the plaintiff would be deemed aggrieved, Bossert Corporation v. Norwalk,157 Conn. 279, 285 (1968). As the Commission denied this affordable housing application, this court found at trial, and reiterates herein, that the plaintiffs have a specific and legal interest which has been injuriously affected by the Commission's decision and are therefore aggrieved. Walls v. Planning and Zoning Commission, 176 Conn. 475, 477-78 (1979).
 B.
1.
General Statutes 8-30g modifies judicial review of land development applications which include a certain percentage of affordable housing. The parties are in agreement that this application is governed by this statute. The Commission has admitted the applicants' allegations that this application meets the requirements of an affordable housing development. (Answer, Para. 8, 9, 10; General Statutes 8-30g(a)(1); fn. 1, CT Page 5047 supra). Accordingly, the Commission's denial must meet the four tests set forth in General Statutes 8-30g(c):
 (c) Upon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that (1) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (2) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (3) such public interests clearly outweigh the need for affordable housing; and (4) such public interests cannot be protected by reasonable changes to the affordable housing development. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal is taken in a manner consistent with the evidence in the record before it.
A review of this section indicates that the legislature has now placed the burden on the commission, and not, as in traditional land use appeals, on the applicant. Like a traditional appeal, however, the evidence is to be gleaned from the record as the Commission is required to cite reasons for its decision and the reasons are to be supported by sufficient evidence. The rule in Connecticut is that "where a zoning commission has formally stated the reasons for its decision, the court should not go behind that official collective statement of the commission. It should not attempt to search out and speculate upon other reasons which might have influenced some or all of the members of the commission to reach the commission's final collective decision." DeMaria v. Planning Zoning Commission, 159 Conn. 534, 541 (1970); Central Bank for Savings v. Planning Zoning Commission,13 Conn. App. 448, 457 (1988); Allied Plywood, Inc. v. Planning Zoning Commission, 2 Conn. App. 506, 512 (1984). CT Page 5048
2.
 a.
The Commission cited nine reasons for the denial in the April 20, 1992 letter to the applicants from Town Planner William S. Voelker. (Return Item JJ):
 1. The plan does not comply with existing regulations for the R-43 zone nor with the existing affordable housing regulations. The Commission is therefore prohibited from approving this proposal by Section 8-26 of the statutes.
 2. There was insufficient demonstration that there would be no adverse impact on the adjacent neighborhood.
 3. It was not demonstrated that affordable housing units will be of comparable size and workmanship as intended by the legislature in its affordable housing legislation including Section 8-2g.
 4. There was no information given on housing prices nor any financial justification given for the proposed density bonus.
 5. The applicant did not seek the remedy of an amendment to the zoning regulations or amendment to the zoning map.
 6. There is insufficient usable area on-site for recreational purposes to support the increased density.
 7. The retaining walls on the site plan present safety and maintenance problems for the homeowners. Lots with slopes in excess of fifteen percent do not comply with the subdivision regulations and the proposed walls are an unacceptable solution.
CT Page 5049
 8. The property is within a watershed and recharge area for potential wells and future water supply. No evidence has been presented to indicate that the development will not be detrimental to future water supply development.
 9. Approval of this application would subvert the planning process for affordable housing as outlined in the Plan of Development.
 b.
While many of the above reasons raise significant issues, especially reasons one and five (noncompliance with existing zoning), the court will only address reason three at this time.
Reason three states:
 3. It was not demonstrated that affordable housing units will be of comparable size and workmanship as intended by the legislature in its affordable housing legislation including Section 8-2g.
The developer has proposed to construct five styles of houses: Yarmouth — first floor, 1260 sq. ft.; second floor, 540 sq. ft.; Boothbay — first floor, 730 sq. ft.; second floor, 730 sq. ft.; Freeport — first floor, 1033 sq. ft.; second floor, 540 sq. ft.; Bar Harbor — first floor, 1120 sq. ft.; second floor, 970 sq. ft.; and Rockport — first floor, 1290 sq. ft.; second floor, 1110 sq. ft. (Return Item QQ). Of the eight Freeport models, five are designated as affordable and one of the proposed six Boothbay models is designated as affordable. There is no question that the affordable units are generally smaller. Yet, three of the Freeport models and five of the Boothbay (the smallest) are regularly priced homes. The Yarmouth homes, marginally larger, are also regularly priced. This court does not find any evidence that there is an unlawful discrepancy as to total size.
There is more, however, to this issue than mere total CT Page 5050 square footage. The record indicates that the developer intends on not finishing the upstairs of the affordable units. (Return Item D). On its face there is nothing terribly wrong with this concept. Not finishing the second floor of starter homes has been a time honored tradition to reduce the purchase price. The Commission indicates that this is a violation of General Statutes 8-2g as well as the affordable housing legislation generally. Section 8-2g provides authority for a Commission to promulgate regulations to allow it to enter into a contract with a developer to build multifamily units at a higher (bonus) density. The contract requires the units to be affordable as defined by General Statutes 8-39a and to be of comparable size and workmanship. (Emphasis added). The statute, section one of P.A. 88-338 ("An Act Promoting the Development of Affordable Housing through the Use of Municipal Planning and Zoning Authority"), was passed one year before the Act and an appeal of a decision involving Section 8-2g
could, if the requirements were met, fall within the Act.
The phrase "comparable size and workmanship" is not found in the Act. Moreover, section 8-2g has somewhat conflicting provisions such as the dedication period of thirty years (as opposed to twenty), income restrictions based on the area median income of the municipality (as opposed to 80% of the area median income), and a fluctuating sales price.
This court concludes that although the "comparable size and workmanship" standard is not specifically mentioned in Section 8-30g, it is logically and inherently a part of the Section 8-30g definition. First, the legislature is presumed to exercise its statutory authority with knowledge of existing statutes and with the intention of creating one consistent body of law. Kinney v. State, 213 Conn. 54 (1989). As indicated, Section 8-2g was enacted before the appeals act and the legislature knew of the size and workmanship language it had previously enacted in defining affordable housing. Second, the legislature is presumed to have a purpose in each sentence or clause, Turner v. Turner, 219 Conn. 703, 713 (1991). The purpose of the size and workmanship requirement was to prohibit a developer from taking advantage of bonus densities and building "lesser" units.
Third, "in attempting to reconcile ambiguous or potentially duplicative statutes, every intent is made to construe statutory schemes as a whole. Roach v. Roach, 20 Conn. App. 500
CT Page 5051 (1990). Or, in attempting to construe an ambiguous statute, the court must "look to [the] purpose [the] statute was to serve as revealed by the legislative history and circumstances surrounding its enactment." Mahoney v. Lensink,213 Conn. 548, 563 (1990). That purpose, to provide affordable housing for the people of Connecticut, was discussed by this court in TCR, supra.
The problem with the applicants' proposal is that it may discriminate against larger families. The designated units are fine for individuals, couples, or families needing only one or two bedrooms. However, for those needing more, there is no guarantee that the unit will meet the affordable guidelines.
The concept of affordable housing is premised on the need for a variety of homes. Colton Homes v. Council of Housing,582 A.2d 1024, 1035 (N.J.Super., A.D. 1990); Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel,336 A.2d 713, (1974). In commenting on Mount Laurel and its progeny, the New Jersey Supreme Court noted that "every municipality . . . must provide a realistic, not just theoretical opportunity for the construction of lower income housing." Holmdel Builders Assn. v. Township of Holmdel, 583 A.2d 277,283 (N.J. 1990) (emphasis in original). While Connecticut's program is clearly different, the realistic, as opposed to theoretical, opportunity concept is not. In this case, realistic opportunity means housing for all sizes of families.
This court notes that the authority set forth in Section 8-2g(b) to adopt regulations to administer a rental program for the affordable units prohibits discrimination against a potential applicant for, inter alia, the number of children. This restriction is consistent with both the federal and state Fair Housing Acts, 42 U.S.C. § 3360 et. seq.; Conn. Gen. Stat. 46a-64b et. seq., and this court cannot ignore this aspect. In construing a statute, the legislature is presumed to have intended a reasonable, just and constitutional result. Sanzone v. Board of Police Commissioners,219 Conn. 179, 187 (1991). Accordingly, this court concludes that a developer and a commission may not discriminate against larger families by only building or approving smaller units. Thus, inherent in the definition is a requirement that the affordable units must be equal to the nonrestricted units in comparable size and workmanship. CT Page 5052
If the applicant wishes to construct a standard subdivision and not finish the second floor of the homes, he may certainly do this. There is nothing in the Berlin subdivision regulations that appear to prohibit this and, of course, an agency may not "in utter disregard of the regulations disapprove a plan for a reason it would not be required to apply to all applications. . . ." R K Development Corp. v. Norwalk,156 Conn. 369, 377 (1968). The developers come here not under traditional subdivision review but under this new burden switching remedial program seeking a higher density in return for building affordable units. This court has insufficient information to determine whether the sales price of a finished affordable unit would meet the cost guidelines. Simply put, if the developers wish to leave the second floor unfinished, to reduce the purchase price, they must affirmatively state and/or provide the option for a finished upstairs (that will accommodate larger families) at a sales price that will satisfy the statutory guidelines. The Commission was legitimately concerned with the applicants' failure to provide affordable housing as defined by statute. This concern qualifies as a substantial public interest which may outweigh the need for this proposal.
This concern was also noted in reason four which mentioned the lack of information on housing prices. The applicants did not submit any proposed sale prices but only indicated that the project would comply with the statutory formula. (Return Items D, p. 4; Y; QQ). The information, however, was for unfinished homes. The applicants also did not utilize the provisions of Section 8-30g(d) and file a proposed modification concerning the cost of finishing the second floor.
As noted, the Commission cited nine reasons to support its denial. Until reason three is resolved, this court need not discuss the remaining reasons.
 III.
Conclusion
The applicants have sought to construct a housing development at a density much greater than that allowed under existing zoning. The necessary quid-pro-quo for the bonus is CT Page 5053 the construction of affordable housing. If the applicants are merely seeking to construct unfinished homes (which they could do notwithstanding this Act) and reap the benefits of the Act by labeling them "affordable," the Commission's conclusion based on reason three will be upheld. Goldberg v. Zoning Commission, 173 Conn. 23, 26 (1977).
The legislature has clearly recognized the need for such housing. It gave this court the power to remand, in addition to other broad powers, to determine whether a Commission has satisfied its statutory burden. General Statutes8-30g(c); TCR, supra. The issue for remand is whether the units, if finished, would still satisfy the statutory guidelines. After a presentation on this issue and further deliberations by the Commission, counsel should report to this court.
MARSHALL K. BERGER, JUDGE, SUPERIOR COURT