768 A.2d 233 (2001)
338 N.J. Super. 103
In re PETITION FOR SUBSTANTIVE CERTIFICATION, TOWNSHIP OF SOUTHAMPTON, COUNTY OF BURLINGTON, New Jersey.
Superior Court of New Jersey, Appellate Division.
Argued December 12, 2000.
Decided March 20, 2001.
*234 appellant L.T.D., L.L.C. (Flaster, Greenberg, Wallenstein, Roderick, Spirgel, Etal, attorneys, Cherry Hill; Mr. Bisgaier and Christopher E. Kaltenbach, Philadelphia, PA, on the brief).
Ronald C. Morgan, Marlton, argued the cause for respondent Southampton Township (Parker, McCay & Criscuolo, attorneys; Stacy L. Moore, Jr., on the brief).
William P. Malloy, Deputy Attorney General, argued the cause for respondent Council on Affordable Housing (John J. Farmer, Jr., Attorney General, attorney; Nancy Kaplen, Assistant Attorney General, of counsel; Mr. Malloy, on the brief).
Before Judges SKILLMAN, WECKER and LESEMANN.
The opinion of the court was delivered by SKILLMAN, P.J.A.D.
This is an appeal by L.T.D., L.L.C. (LTD), a contract purchaser of property in the Township of Southampton, from a final decision of the Council on Affordable Housing (COAH), granting substantive certification under the Fair Housing Act, N.J.S.A. 52:27D-301 to -329, to an affordable housing compliance plan submitted by Southampton, and denying LTD's motion *235 for reconsideration. The primary issue presented is whether COAH is required to consider information which indicates that a municipality's compliance plan does not comply with COAH's regulations and does not provide a realistic opportunity for satisfaction of the municipality's affordable housing obligation, if the information is provided by a party who failed to file a timely objection to the plan.
Southampton is a forty-three square mile township in Burlington County with a population of about 10,000 people. It has two developed areas, the Village of Vincentown, a well-preserved historic district occupied by approximately 200 structures, and the Leisuretown retirement community. The rest of Southampton consists mainly of farmland.
In 1989 COAH granted Southampton substantive certification for a compliance plan that provided Southampton with protection from exclusionary zoning litigation from 1989 to 1995. COAH determined that Southampton's affordable housing obligation during that period was 114 units, which Southampton satisfied by providing for the rehabilitation of 2 units and rezoning for 112 new affordable units to be constructed on a site in the municipality's Rural Residential (RR-1) zone. However, because there is no public water or sewer service on this site, Southampton was able to obtain a "durational adjustment," under which it was allowed to postpone satisfaction of its affordable housing obligation until water and sewer service actually become available. It is undisputed that no new affordable housing was constructed or even authorized in Southampton during the six-year period of its initial substantive certification.
Southampton petitioned for substantive certification of a new compliance plan in May 1995. As of that time, COAH had determined that Southampton's "second cycle" affordable housing obligation was 153 units.[1] Southampton's compliance plan again proposed to satisfy a substantial portion of this obligation through the same site in the RR-1 zone relied upon in the 1989 plan, which still had no public water or sewer service. After COAH rejected Southampton's initial plan and directed it to file an amended plan, Southampton identified another site for affordable housing immediately adjacent to the site in the RR-1 zone, which also had no water or sewer service. Southampton again sought a durational adjustment for the entire portion of its affordable housing obligation which it proposed to satisfy by rezoning for new construction.
On July 9, 1997, COAH rejected Southampton's petition for substantive certification for various reasons, including the fact that neither site the municipality had designated for affordable housing had water or sewer service. The report of COAH's planner upon which COAH based its rejection of Southampton's compliance plan stated that "[i]f Southampton intends to address its obligation through inclusionary zoning, it must first consider land within the Village of Vincentown for affordable housing to the extent that vacant land and sewer are available." The report also noted that "there are techniques available to the township other than zoning for addressing its affordable housing obligation (rehabilitation of deficient units, group homes, regional contribution agreements, accessory apartments, conversions of old schools or firehouses, buy-down program, etc.)."
On October 7, 1997, Southampton submitted a revised compliance plan and re-petitioned for substantive certification. The revised plan continued to rely upon *236 the site in the RR-1 zone to satisfy sixty-eight units of the municipality's affordable housing obligation, and again sought a durational adjustment for that site. In addition, in place of the site adjacent to the site in the RR-1 zone included in the rejected plan, Southampton substituted two parcels of land in a zoning district designated as TC-1, in which it claimed 186 housing units could be constructed, including 37 affordable to lower income households. The revised plan noted that "[t]he sewer system is within a few hundred feet of these parcels and easily accessible," and that Southampton is "in the process of amending [its] Wastewater Management Plan to include these parcels within [its] sewer service area." Southampton's revised plan also proposed a rehabilitation program for forty-eight existing deficient housing units within the municipality.
On March 13, 1998, COAH's planner submitted a report which recommended that Southampton be granted conditional substantive certification. This report stated that the owners of the properties in the RR-1 site had all signed statements expressing their belief that "the zoning on the site [for high density development that will include affordable housing] is realistic and that the reason the parcel did not develop during the previous certification was the decline of the housing market." However, the planner's report noted that there is no public water or sewer service in the RR-1 zone, and that the site "is not included in the sewer service area." The report also noted that Southampton proposed to re-zone two lots in the TC-1 zone, which "will yield 37 affordable units," and that Southampton was in the process of revising its wastewater management plan (WMP) to include the TC-1 zone in the sewer service area.
On March 23, 1998, Southampton/38 Associates, the owner of the largest lot in the RR-1 zone designated for affordable housing, sent a letter to COAH which stated that "the bulk of the 56 acres" on which housing was proposed to be built was "subject to wetlands designation and that only approximately 24 of the 56 acres is buildable." The letter suggested that "the 56acre[s] designated [in the] plan [be] expanded to include adjoining properties which are qualified uplands."
On March 30, 1998, LTD sent a letter to COAH which also alleged that "the proposed RR-1 Zone cannot realistically achieve the development anticipated and yield the designated number of affordable units." This letter was accompanied by a memorandum prepared by LTD's planner, which stated that photo-infrared mapping of the area by the Department of Environmental Protection (DEP) showed only 40.6 acres of upland and that "[w]hen the wetlands, buffers and non-developable lands are excluded ... [,] developable land is only 27.1 acres." LTD requested COAH to postpone action on Southampton's petition for one month to consider this information.
On March 31, 1998, COAH's executive director sent a letter to LTD denying its request to postpone consideration of Southampton's petition, and on April 1, 1998, COAH voted to grant conditional substantive certification to Southampton's compliance plan. The conditions that Southampton was required to satisfy to obtain final certification included submission to the DEP of an amendment of its WMP to extend the sewer service area to the two lots in the TC-1 zone designated for affordable housing. The resolution granting conditional substantive certification did not mention that the proposed affordable housing site in the RR-1 zone had no public water or sewer service, and that there were no plans for extending those services to the area. The resolution also did not respond to Southampton's request for a durational adjustment for this site.
On July 1, 1998, COAH voted to grant Southampton final substantive certification. COAH's resolution noted that "Southampton [had] submitted an amended [WMP] to the DEP [to extend its sewer *237 service area to include the two lots in the TC-1 zone]." The resolution also stated that "COAH shall monitor the DEP approval process for Southampton's [WMP] amendment and if Southampton Township's [WMP] amendment cannot be approved by DEP within two years, COAH may require Southampton Township to amend its housing element and fair share plan to address the units in the TC-1 zone." However, this resolution again failed to mention the lack of any public water or sewer service in the RR-1 site or Southampton's request for a durational adjustment.
On July 13, 1998, LTD submitted a motion for reconsideration of the grant of final substantive certification to Southampton. Accompanying the motion was a memorandum prepared by LTD's planner which revealed that the two lots in the TC-1 zone that Southampton had designated for a total of 186 housing units, including 37 affordable units, are already occupied by substantial commercial structures. The smaller lot contains a heating oil company office building erected in 1996 as well as a number of other structures. The larger lot contains a warehouse complex. Although the structures in this complex are vacant, LTD's planner indicated that "[t]he demolition costs ... would be quite expensive and may require state environmental approvals." He also stated that there are several other tracts near the two lots that Southampton placed in the TC-1 zone which would be more suitable for affordable housing.
Southampton's planning consultant submitted a certification in opposition to LTD's motion which stated that "[t]he sites in which the movant is claiming as more suitable for growth do not meet Southampton's Master Plan goals and objectives, the [State Development and Redevelopment Plan] goals and objectives and Burlington County's support of preserving the referenced parcels for farmland." He also asserted that the heating oil company had "abandoned" the smaller lot in the TC-1 zone. Southampton's planner did not comment upon the LTD planner's opinion that the demolition of the buildings on the larger lot "would be quite expensive and may require state environmental approvals."
On October 19, 1998, LTD submitted an additional certification by another planner, which concluded that there is no realistic possibility that affordable housing will be constructed in the RR-1 zone because there are no plans to extend sewer service to the area:
The proposed Southampton Township Wastewater Management Plan, pending before NJDEP since 1995, still does not propose extending sewer service to the RR-1 zone.... Without sewer infrastructure, there is no likelihood that inclusionary development will take place in the RR-1 zone.
He also reaffirmed that an active business is being conducted on the smaller of the lots in the TC-1 zone:
Lot 20 is owned by the Allen heating oil and propane gas company, which operates a clean, well-maintained, nicely-landscaped, apparently thriving business on its 2.20 acre lot. The lot includes a two story office building for the business, as well as freshly painted storage tanks and parking areas for customers and a small fleet of brightly painted trucks.
In addition, LTD's planner concluded that even if the two lots in the TC-1 zone were developed for high density housing, they could not accommodate the thirty-seven units of affordable housing envisioned by Southampton's compliance plan, because the sites include substantial wetlands and Southampton's zoning ordinance imposes significant regulatory constraints upon high density residential development.
On January 5, 1999, COAH denied LTD's motion for reconsideration on the ground that it was untimely, and that granting the motion would undermine the statutory and regulatory provisions that *238 govern the filing of objections to municipal compliance plans:
[I]f COAH were to now grant LTD's motion for reconsideration of COAH's substantive certification decision, COAH would essentially be retroactively allowing LTD to intervene as an objector in this matter. Such an action would be in contravention of the FHA, which specifically states at N.J.S.A. 52:27D-314 that there are 45 days from the date of a municipal petition for substantive certification to file an objection. COAH has always rigorously enforced this statutorily-required 45 day period. Indeed, as a statutory requirement, it is not waivable; which in essence is what LTD seeks with its motion for reconsideration.
The engineering and planning reports upon which LTD bases its motion for reconsideration are the kind of reports that COAH typically requires from objectors to substantiate their objections to filed fair share plans.... The reports do not convince COAH that its decision granting substantive certification was arbitrary or capricious, "palpably incorrect or irrational" and therefore COAH will not alter its grant of substantive certification based upon the submitted reports.
....
If the material submitted by LTD in support of its motion for reconsideration had been submitted by an objector within the statutorily required 45 day objector period provided by N.J.S.A. 52:27D-314, COAH would be obligated to give the reports more scrutiny than it has in the context of this motion.
COAH's opinion did not address the issues that LTD had raised concerning the potential for actual construction of affordable housing in the TC-1 zone. In addition, COAH concluded that water and sewer service could be made available to the site in the RR-1 zone based solely on the owners' signed statements expressing their belief that the zoning in the RR-1 district is realistic.
LTD then filed this appeal from the denial of its motion for reconsideration and the grant of final substantive certification to Southampton.
On appeal, LTD argues that the information it provided to COAH shows that Southampton's compliance plan does not comply with COAH's regulations and does not provide a realistic opportunity for Southampton to satisfy its affordable housing obligations. Southampton and COAH respond that COAH was not required to give full consideration to the factual materials submitted by LTD because LTD failed to file a timely objection to Southampton's compliance plan.
We conclude that the factual materials LTD submitted to COAH raise serious questions as to whether Southampton's compliance plan conforms with COAH regulations and provides a realistic opportunity for the construction of affordable housing, and that COAH failed to give adequate consideration to those materials. Consequently, we reverse the grant of substantive certification to Southampton and remand the case to COAH.[2]
The Fair Housing Act created an administrative agency, COAH, which has been assigned broad authority and responsibility to determine the size of municipal affordable housing obligations and whether municipal compliance plans provide a realistic opportunity for the satisfaction of those obligations. See Hills Dev. Co. v. Township of Bernards, 103 N.J. 1, 31-40, 510 A.2d 621 (1986). If a municipality chooses to invoke the administrative process established by the Act, COAH assumes the role that otherwise would be performed by a trial court hearing a *239 Mount Laurel exclusionary zoning case.[3] COAH determines whether the municipality has devised a plan which satisfies its affordable housing obligations, and if COAH makes this determination, it grants substantive certification to the municipality, which essentially confers six years of repose from Mount Laurel litigation. See N.J.S.A. 52:27D-317(a).
A municipality can obtain this repose by filing a petition for substantive certification with COAH. N.J.S.A. 52:27D-313. Any party that opposes the grant of certification must file an objection within 45 days of publication of notice of the petition. N.J.S.A. 52:27D-314. If any objection is filed, COAH must meet with the objectors and the municipality and attempt to mediate a resolution of the dispute. N.J.S.A. 52:27D-315(b). If mediation is unsuccessful, COAH must transfer the matter to the Office of Administrative Law as a "contested case." N.J.S.A. 52:27D-315(c).
However, even if no objection is filed, COAH may grant substantive certification only if it finds that "[t]he municipality's fair share plan is consistent with the rules and criteria adopted by [COAH] and not inconsistent with achievement of the low and moderate income housing needs of the region ...;" N.J.S.A. 52:27D-314(a), and that the "plan make[s] the achievement of the municipality's fair share of low and moderate income housing realistically possible." N.J.S.A. 52:27D-314(b).
Under this statutory framework, COAH's grant of substantive certification plays a critically important role. If a municipality obtains substantive certification of a plan that does not actually make the achievement of a municipality's affordable housing obligation "realistically possible," the municipal zoning ordinance would nevertheless be entitled to a "presumption of validity" in any Mount Laurel litigation challenging the ordinance. N.J.S.A. 52:27D-317(a). To overcome this presumption, a party challenging the ordinance must "demonstrate by clear and convincing evidence that the housing element and ordinances implementing the housing element do not provide a realistic opportunity for the provision of the municipality's fair share of low and moderate income housing." Ibid. Thus, the grant of substantive certification effectively insulates a municipality from exclusionary zoning lawsuits for six years. See Hills Dev. Co. v. Township of Bernards, supra, 103 N.J. at 35, 510 A.2d 621; Calton Homes, Inc. v. Council on Affordable Hous., 244 N.J.Super. 438, 443, 582 A.2d 1024 (App. Div.1990), certif. denied, 127 N.J. 326, 604 A.2d 601 (1991).
In view of the critically important role substantive certification plays in the administration of the Fair Housing Act, COAH has a responsibility to do more than simply conduct a paper review of a municipality's submission in support of a petition for certification. COAH must conduct its own independent evaluation of the compliance plan, which ordinarily should include a visit to any sites the municipality proposes to rezone for new affordable housing and consultation with other agencies, such as the Department of Environmental Protection and State Planning Commission, to determine whether construction of high density housing on the sites would conflict with the regulatory policies those agencies are charged with implementing. COAH also must obtain verification that the infrastructure required for a proposed development that includes affordable housing is available or that there is a realistic prospect it will become available.
Most pertinent to this appeal, COAH should not disregard or give only perfunctory consideration to information supplied by a property owner or other interested party concerning the feasibility *240 of a compliance plan simply because that party has not filed a timely objection to the plan. A municipality has an obvious incentive to present a favorable picture of its plan, and COAH's capacity to make an independent evaluation of the information a municipality submits in support of a plan may be limited by time and resources. Consequently, a property owner or other interested party may provide valuable information that would not otherwise be available to COAH. COAH should not turn a deaf ear to such information simply because the source is a party which failed to file a timely objection to the plan.
In this case, COAH apparently was unaware when it granted substantive certification to Southampton that both lots on the TC-1 site, one of the primary sites the municipality has designated for affordable housing, are already occupied by substantial commercial structures. Although Southampton's submission in support of its petition did not represent that the lots are vacant, it failed to disclose that they are already developed. Furthermore, there is no indication in the March 13, 1998 report of COAH's planner recommending conditional substantive certification, or in the COAH resolutions granting conditional and final certification, that COAH became aware of the commercial development on the lots during the course of its review of Southampton's compliance plan. Therefore, it appears that the first information COAH received concerning this potentially significant impediment to development of the TC-1 site for affordable housing was the planner's memorandum accompanying LTD's motion for reconsideration.
COAH's receipt of this information should have triggered a full-scale inquiry concerning the viability of Southampton's compliance plan. At a minimum, COAH's staff should have made a site inspection to verify the existence of the alleged commercial development on the TC-1 site and determined what business activities are currently being conducted there. Its staff also should have communicated with the owners to determine their plans for future use of the site and whether they would be interested in using the property for high density residential development which would include affordable housing. In addition, COAH's staff should have inquired whether the DEP has identified any environmental constraints upon development of the properties for residential use. Furthermore, COAH should have required Southampton to explain why it failed to affirmatively disclose the commercial development in the TC-1 zone and to discuss the impact of that development upon potential future development for affordable housing. COAH also should have investigated whether wetlands on the two lots imposed the significant constraints on development described by LTD's planner.
However, insofar as the record before us reveals, COAH's reaction to the receipt of this significant information from LTD was completely passive. COAH's staff did not conduct any site inspection or make any inquiry of the owners of the lots in the TC-1 zone, Southampton public officials, or the DEP. Nor did COAH direct its planner to submit a supplemental report evaluating the significance of this new information.
COAH's ultimate response to LTD's motion for reconsideration was a thirteen-page written opinion which failed even to mention the existing commercial development in the TC-1 zone that LTD had brought to light. As a result, we cannot determine whether COAH gave any real consideration to this information and, if so, what conclusions it reached concerning the effect of the present commercial development on the feasibility of future construction of affordable housing in the TC-1 zone. Therefore, the case must be remanded to COAH for this purpose.
LTD's submission to COAH, together with the letter to COAH from Southampton/38 Associates, the dominant landowner in the RR-1 zone, also raised serious questions as to whether this site *241 contains sufficient buildable land to accommodate the number of units of affordable housing envisioned by Southampton's compliance plan. However, even before receiving this information, COAH should have been aware that the lack of public water or sewer service would preclude high density residential development on the site. In fact, Southampton's petition for substantive certification acknowledged this obstacle to development of the RR-1 site by requesting a second durational adjustment, upon which Southampton again would have been allowed to postpone satisfaction of its affordable housing obligation until water and sewer service actually became available, and COAH rejected Southampton's initial plan on the ground that it failed to consider whether there is vacant land in the Village of Vincentown that is accessible to water and sewer service. Furthermore, the March 13, 1998, report prepared by COAH's planner again noted that there is no existing public water or sewer service in the RR-1 zone and that the zone is not included in Southampton's sewer service area.
In addition, during the three-month period between the grant of conditional and final substantive certification, COAH received a copy of a letter to Southampton's Mayor from the Assistant Commissioner of DEP for Environmental Planning and Science, which indicated that Southampton's wastewater management plan (WMP) did not propose the extension of sewer service to the RR-1 zone:
There is a Rural Residential 1 Zone which has been used to fulfill part of Southampton Township's Council on Affordable Housing (COAH) obligation. This zone can only be used to meet the COAH requirements if water and sewer are provided to the site. No sewer service was proposed for this site in the Southampton Township WMP.
After receiving this letter, Southampton failed to amend its WMP to include a proposal for extending sewer service to the RR-1 zone. Nevertheless, COAH granted final substantive certification to Southampton without even mentioning the DEP letter.
COAH's regulations explicitly recognize that sewer and other infrastructure must be available to establish a realistic opportunity for the construction of affordable housing. Under those regulations, any site designated for new affordable housing must be "available, suitable, developable and approvable." N.J.A.C. 5:93-5.3(b). To be considered "developable," a site must have "access to appropriate water and sewer infrastructure," and must be consistent with the applicable areawide water quality management plan, including the WMP, or a pending amendment to that plan. N.J.A.C. 5:93-1.3; see also N.J.A.C. 5:93-4.3(a), -5.3(b).
COAH may grant substantive certification only if it finds, among other things, that "[t]he municipality's fair share plan is consistent with the rules and criteria adopted by [COAH]." N.J.S.A. 52:27D-314(a). Nevertheless, COAH granted final substantive certification to Southampton without finding that Southampton's compliance plan complied with COAH's regulations requiring sites designated for Mount Laurel housing to be included at least within an application for amendment to the municipality's water quality plan, including the WMP, as required by N.J.A.C. 5:93-1.3 and N.J.A.C. 5:93-5.3(b). Moreover, insofar as the record before us indicates, even if the resolution granting substantive certification had addressed the issue, COAH had no information that would have justified this finding. Consequently, the grant of substantive certification to a compliance plan that designated the RR-1 zone for affordable housing violated COAH's own regulations.
The first time COAH addressed the lack of sewer service to the site in the RR-1 zone was in its opinion denying LTD's motion for reconsideration, which stated that:
[W]hen a municipality lacks sewer and water, COAH will review the inclusionary *242 site to determine if there is a realistic opportunity for the site to receive the necessary sewer and water during the six year certification. All current property owners within the RR-1 zone, including the owner of the site of which LTD is the contract purchaser, signed statements submitted with Southampton's fair share plan. These statements stated that the zoning in the RR-1 zone was realistic and that the reason the parcels did not develop during the previous certification was the decline of the housing market. COAH concluded that sewer and water would be made available if the owners decided to develop the property under the RR-1 zone.
The "signed statements" relied upon by COAH were a form letter signed by each owner of a lot designated for affordable housing, which stated:
We, ... hereby agree to the inclusion of our property in the RR# 1 zoning district. We are aware of the fact that this district is zoned at six (6) units per acre with a twenty percent (20%) set aside for affordable housing.
We believe that this zoning provides a realistic opportunity for the future development of the site. The decline of the housing market during the previous six-year certification is the reason the property has not been developed, as of date.
However, these letters did not directly address the availability of sewer service to the RR-1 zone. Moreover, there is no indication that the property owners who signed the form letters made any investigation of the availability of sewer service or that they would have been competent to express an opinion concerning the likelihood of such service becoming available. In any event, COAH's regulations do not authorize a municipality to designate a site for affordable housing based solely on property owners' expressions of optimism concerning the developability of their lots for this purpose. Rather, as previously noted, those regulations require a site designated for affordable housing to be included in the municipality's water quality plan or at least an application for an amendment to that plan. N.J.A.C. 5:93-5.3(b). Therefore, COAH's reliance upon the property owners' letters as the basis for a finding that public water and sewer service can be made available to the RR-1 site is inconsistent with COAH's regulations governing compliance plan review.
COAH's appellate brief has taken a new approach in defending its approval of Southampton's inclusion of the RR-1 site in its compliance plan. COAH's brief asserts that even though COAH "did not directly address Southampton's request for a durational adjustment with regard to the RR-1 zone[,]" "[i]t is reasonable to assume that this was an oversight ..., because Southampton's third fair share plan was filed in response to COAH's comments ... which stated that the durational adjustment for the RR-1 zone was dependent upon Southampton creating an opportunity for affordable housing within the Vincentown center." COAH's brief concludes that even though COAH "neglected to actually grant the durational adjustment to the RR-1 zone[,]" Southampton did "what COAH's two prior reports had required of it in order to continue a durational adjustment on the RR-1 zone."
There are several problems with this argument. First, COAH's approval of a durational adjustment is a significant administrative action that allows a municipality to postpone satisfaction of its affordable housing obligations for an indefinite period. Consequently, a durational adjustment should be granted only after careful deliberations by the members of COAH. We cannot simply assume, based on the arguments of COAH's appellate advocate, that the agency intended to grant a durational adjustment, but "neglected" to say so. Second, COAH may grant a durational adjustment only if it makes specific factual findings that justify such relief from the satisfaction of a municipality's affordable housing obligation. If an adjustment is *243 sought on the basis of an alleged lack of the infrastructure required for affordable housing, COAH can grant the adjustment only if it finds that the municipality has "insufficient water and/or sewer to support inclusionary development." N.J.A.C. 5:93-4.3(a). To make this finding, COAH obviously must consider not only the availability of water and sewer service to the sites the municipality has designated for affordable housing, but also to other potential sites. Ibid. However, COAH did not make this required finding, because it never explicitly considered Southampton's request for a durational adjustment.
Moreover, if COAH finds that a municipality is entitled to a durational adjustment, the grant of substantive certification must be conditioned upon the municipality's adherence to requirements designed to maximize the opportunities for actual construction of affordable housing. N.J.A.C. 5:93-4.3(c) provides in part:
1. Notwithstanding the lack of adequate water and/or sewer at the time a municipality petitions for substantive certification, the municipality shall reserve and set aside new water and/or sewer capacity, when it becomes available, for low and moderate income housing, on a priority basis;
2. Municipal officials shall endorse all applications to the DEP or its agent to provide water and/or sewer capacity....
3. Where the DEP or its designated agent approves a proposal to provide infrastructure to a site for the development of low and moderate income housing identified in the housing element, the municipality shall permit such development; and
4. Where a municipality has designated sites for low and moderate income housing that lack adequate water and/or sewer and where the DEP or its designated agent approves a proposal to provide water and/or sewer to a site other than those designated for the development of low and moderate income housing in the housing element, the municipality shall amend its housing element and fair share housing ordinance to permit development of such site for low and moderate income housing....
Because COAH did not give explicit consideration to Southampton's request for a durational adjustment, it did not impose any of these obligations upon Southampton. Therefore, we cannot simply assume that COAH intended to grant a durational adjustment to Southampton even though it failed to make the findings or impose the conditions that its own regulations require for such an adjustment.
In conclusion, COAH abused its discretion by failing to give any meaningful consideration to the information provided by LTD, which raised serious questions concerning the feasibility of construction of affordable housing in the TC-1 zone. Furthermore, COAH violated its own rules by granting substantive certification to Southampton, because Southampton's own submission failed to show that there is any realistic likelihood public water and sewer service will be extended to the RR-1 site or that Southampton has given adequate consideration to other possible sites. Accordingly, the grant of substantive certification to Southampton is reversed, and the case is remanded to COAH.
NOTES
[1] COAH's regulations include calculations of municipal affordable housing obligations, initially for the "first cycle," 1987-93, and then for the cumulative "second cycle," 1987-99. See N.J.A.C. 5:93-2.1 and 2.20 and Appendix A to N.J.A.C. 5:93. The substantive rules for the "second cycle" have since been extended until May 5, 2004, see 31 N.J.R. 578(a); 31 N.J.R. 1479(a), but COAH has not yet made calculations of "third cycle" affordable housing obligations.
[2] Our reversal on these grounds makes it unnecessary to consider LTD's alternative argument that COAH should have required Southampton to re-petition for substantive certification.
[3] See Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel, 92 N.J. 158, 456 A.2d 390 (1983).