928 A.2d 61 (2007)
395 N.J. Super. 1
CRAMER HILL RESIDENTS ASSOCIATION, INC., Maria Calaf, Felipe Diaz, Nilda Diaz, Magda Jusino, Carmen Lopez, Marcos Lopez, George Murray, Darlene Figueroa, and Wanda Quiles, Plaintiffs-Appellants, and
Ablett Village Resident Association, Centennial Village Tenants' Action Council, Carmen Arce, Velletta Bailey, Carmen Barbosa, Teresa Belcher, James Blue, Elwood Brown, Donald Brown, Iris Capo, Shakia Carney, Kalisha Carter, Carmen Castro, Dolores Chapman, Ernestine Chase, Lydia Cintron, Maria Diaz, Carmen Flores, Latonya Ford, Babbette Gilbert, Lavern Gilchrist, Carmen Gonsalez, Aida Gonzalez, Karen Hairstone, Cheryl Hall, Sandra Hilton, Edna Hinkle, Demitron Hunter, Dawn Jenkins, Alleeish Jones, Sharon Joyce, Veronica Lovett, Elizabeth Malare, Eusenio Martinez, Virgilio Matias, Carmen Mendez, Ivelisse Mercado, Monique Mitchell, Rose Mitchell, Lakeisha Molock, Olga Morales, Sugeid Morales, Johanna Muniz, Katherine Muniz, Yolanda Nash, Belinda Norris, Ruth Oliveras, Yolanda Ortiz, Miguel Morales, Marisel Pabon, Phyllis Perry, Juanita Peters, Christine Peters, Deborah Phillips, Sharon Phillips, Carmen Planteny, Elizabeth Ponce, Floyd Pope, Jose Quinones, Samuel Reyes, Angel Rosa, Conrada Sanchez, Linnette Santiago, Teresa Santiago, Mary Simpson, Aricka Smith, Elicia Sosa, Nancy Surgick-Inge, Lisa Tatum, Luz Vasquez, Maria Villanueva, Ada Washington, Tony Whidbee, Carmen Acevedo, Hilda Ahart, Bernard Barfield, Teresa Berroa, Richard Brown, Hannah Brown, Carmen Cardona, Jesus Cordero, Mary Cortes, Linda Davis, Rebecca Garcia, Lester Grossnick, Margaret Grossnick, Michael Hagan, James Haulsey, Sara Hernandez, Clayton King, Mary Lewis, John Maher, Larraine Maher, Hector Martinez, Lisa Mellet, Philip Mills, Luz Pacheco, Luzi Reyes, Samuel Reyes, Ana Rivera, Catherine Rivera, Junel Rivera, Lidia Rivera, Carmen Santiago, Jose Santiago, Samuel Santiago, Jose Torres, Maria Acetty, Jose Gonzalez, Nelida Martinez, Vance Mcmanany, Wanda Nieves, Margarita Rivera, Sherman Robinson, Jesenia Roldan, Luz M. Serrano, Tiffany Whitehead, Maria Abuerto, Laura Sharon Baker, Sara Baldwin, Lisa Boswell, Laura Brown, Nicole Burgos, Margit Burkhaltiz, Mildred Caraballo, Cynthia Carter, Carmen Cintron, Jeanne Clark, Marilyn Clark, Gabriela Colon, Kevin Dorman, Carmen Figueroa, Carmen Garcie Correa, Elmer Hammond, Angel Isquierdo, Sheila Johnson, Delores Jones, Claribel Larios, Gertrude Lewis, Alberto Lopez, Norma Matos, Juanita McCoy, Aileen Medina, Kylene Medina, Sylvia Mercado, Sara Mojica, Delia Molina, Felicia Parker, Josefa Pagon, Edwina Pennington, Tiffany Pritchett, Luz Rentas, Jenythe Ruberte, Lucila Santiago, Leticia Santos, Michelle Seddens, Marisol Senquiz, Chekeya Streater, Daysi Tarqini, Genevieve Torres, Luz *62 Torres, Belinda Vaneman, Betty Vazquez, Olga Vega, Joanna Villegas, Saka Watkins, Evelyn Whetstone, Connie Witcher, Lavenda Wynn, Patricia Wynn, Donna Young, Maria Zapata, Milagros Acosta, Alexander Hernandez, Madelaine Adderley, Bobby Barr, Santo Bonillo, Carmen Cabon, Constance Carstarphen, Danika Daniels, Phenesia Darby, Milagros Diaz, Sandra Gonzalez, Howard Hall, Irma Hernandez, Terri Johnson, Loretta Lee, Miriam Lopez, Luz Molina, Salvador Morales, Rosa Muller, Phoebe Munoz, Teresa Murray, Robert Muse, Nilda Ortega, Lisette Paneto, Linda Perry, Luz Ramos, Tammy Robinson, Ayda Rodriguez, Betsy Toro, Julio Vasquez, Zulma Vasquez, Latisha Williams, Susie Williams, Awilda Zayas, Plaintiffs,
v.
Melvin R. PRIMAS, City of Camden, City of Camden Planning Board, Camden City Council, Camden Redevelopment Agency, Economic Recovery Board for Camden, State of New Jersey, Defendants-Respondents, and
Cherokee Camden, LLC, Michaels Development Company, River Hayes Renewal Associates I, L.P., River Hayes Renewal Associates II, L.P., Intervenors/Defendants.
Superior Court of New Jersey, Appellate Division.
Argued May 9, 2007.
Decided July 17, 2007.
*63 Olga D. Pomar, Camden, argued the cause for appellants (South Jersey Legal Services, attorney; Ms. Pomar, Kenneth M. Goldman and David Podell, on the brief).
William J. DeSantis, Voorhees, argued the cause for respondents Melvin R. Primas and Camden Redevelopment Agency (Ballard Spahr Andrews & Ingersoll, attorneys; Mr. DeSantis, of counsel and on the joint brief).
Lewis Wilson, Camden, attorney for respondent City of Camden, on the joint brief.
Calvin L. Fisher, Marlton, attorney for respondent Planning Board of the City of Camden, on the joint brief.
Daniel P. Reynolds, Senior Deputy Attorney General, argued the cause for respondents Economic Recovery Board of Camden and the State of New Jersey (Stuart Rabner, Attorney General, attorney; Patrick DeAlmeida, Assistant Attorney General, of counsel; Mr. Reynolds, on the brief).
DeCotiis, Fitzpatrick, Cole & Wisler, attorneys for intervenor-defendant Cherokee Camden, LLC, did not file a brief.
Baron & Riefberg, Voorhees, attorneys for intervenor-defendant W. Hargrove Recycling, Inc., did not file a brief.
Before Judges WINKELSTEIN, FUENTES and BAXTER.
The opinion of the court was delivered by
FUENTES, J.A.D.
Plaintiffs, a homeowner's association and individual homeowners affected by the City of Camden's intended redevelopment of an area known as Cramer Hill, appeal from the order of the trial court dismissing the one remaining count in their complaint in lieu of prerogative writs. This action was originally brought to challenge the City's proposed redevelopment plan. After extended litigation, the court invalidated the redevelopment plan, and directed *64 the City to undertake a new needs assessment before proposing a new plan.
Plaintiffs' remaining legal challenge seeks to invalidate an ordinance authorizing the City to acquire property on four sites within the Cramer Hill section of the City, by eminent domain, under the authority of section 325 (N.J.S.A. 52:27D-325) of the Fair Housing Act (FHA). This ordinance was enacted after the redevelopment plan was invalidated. The City alleges that this new land acquisition plan will increase the number of affordable housing units.
The matter came before the Law Division by way of defendants' motion for summary judgment. After considering the documentary evidence presented, and hearing oral argument from counsel, the court dismissed plaintiffs' legal challenge to the ordinance. Plaintiffs now appeal, arguing that the trial court erred in granting summary judgment to defendants because: (1) defendants had not participated in the substantive certification process required under N.J.S.A. 52:27D-313, and were thus not authorized to use the power of eminent domain under N.J.S.A. 52:27D-325; (2) the City had not demonstrated how the ordinance's proposed land acquisition scheme related to meeting the City's fair share housing obligation under the FHA; (3) the proposed development will actually decrease the supply of affordable housing in the City, in direct contravention of the purpose and policies of the FHA; and (4) the City enacted the challenged ordinance in bad faith, in an effort to circumvent the procedural and substantive problems that led to the invalidation of the original redevelopment plan.
After reviewing the record, and in light of prevailing legal standards, we reject the arguments advanced by plaintiffs. We hold that under the express language of N.J.S.A. 52:27D-325, the City has the authority to acquire private property by eminent domain, without having to obtain the substantive certification from the Council on Affordable Housing (COAH) provided for in N.J.S.A. 52:27D-313.
We are nevertheless compelled to remand this matter for the trial court to conduct a fact-finding hearing to determine if the ordinance passed under N.J.S.A. 52:27D-325 will assist the City in meeting its fair share housing obligation under the FHA. Stated differently, the trial court must determine whether the proposed land acquisition plan authorized by the ordinance actually increases the number of affordable housing units in the City.
In going about this task, the trial court should be guided by the overarching public policy supporting the City's authority to take private property by eminent domain under N.J.S.A. 52:27D-325: the exercise of the power of eminent domain granted to municipalities under section 325 is expressly predicated upon a finding that the proposed land acquisition is "necessary or useful for the construction or rehabilitation of low or moderate income housing." Ibid. Absent such a finding, the City lacks the legal authority to proceed under N.J.S.A. 52:27D-325.

I
On February 24, 2005, acting under the authority provided to municipalities in section 325, the City enacted Ordinance MC-4032, authorizing the acquisition of seventy-two parcels of land by eminent domain. The expressed purpose for this acquisition was the "construction or rehabilitation of low and moderate income housing in the Cramer Hill section of the City of Camden." The Ordinance listed the parcels to be acquired as Sites E, F, L and M, identified further by various block and lot numbers *65 on River and Hayes Avenues. The record before us does not include any information as to the types of housing to be erected on the lots listed in the ordinance.
One month later, the Camden Redevelopment Agency forwarded the Workable Relocation Assistance Plan (WRAP) to the New Jersey Department of Community Affairs. This relocation plan was limited to the residents of sites E and F.
For purposes of addressing the issues raised herein, we accept plaintiffs' description of the Cramer Hill community, as an enclave of stability in the midst of a City with a rapidly deteriorating affordable housing stock:
Cramer Hill is a neighborhood . . . located approximately one mile northeast of the downtown area of the City of Camden. Cramer Hill is cohesive and stable, having experienced no population loss between 1990 and 2000, according to Census Bureau reports.
Cramer Hill is approximately 1.8 miles long and approximately 0.8 miles wide, running from the Cooper River on the southwest, northeast along the Back Channel of the Delaware River, north to the boundary of the City of Camden and the Township of Pennsauken, and southeast to a rail yard. Cramer Hill encompasses over one hundred sixty-two (162) city blocks containing nearly four thousand (4000) properties.
The buildings are variously constructed of wood, brick and stone. The residential area contains modest, mostly single and semi-detached family homes. They are primarily of nineteenth century construction with many fine period structures which continue to be solid, comfortable urban dwellings. Many homes are well-maintained and have attractively landscaped yards and gardens.
Cramer Hill is the only neighborhood in Camden City with primarily R1-A low-density zoning, the most restrictive type of zoning provided for in Camden's zoning code. The zoning designation requires large residential lots of 3,000 square feet, with 15 foot yard setbacks, structures no higher than two stories, and a maximum density of 14.5 homes per acre, giving the community an almost suburban character.
Cramer Hill contains one hundred twenty-two (122) storefront and other businesses. There is a thriving aggregation of family owned businesses primarily clustered along River Avenue, but also spread throughout the neighborhood. The majority of these business owners and operators are Latino and African-American. There are also a number of light industrial and some heavy industrial uses, including a demolition and salvage operation and a dredging operation, all primarily located along the Back Channel, between the residential community and the Channel. There are also industrial uses associated with the rail yard.
Cramer Hill is home to several large urban parks and playgrounds, ball fields and a swimming pool, as well as public and parochial schools and numerous houses of worship of many faiths.
A "Determination of Needs" study commissioned by the City in April 2004, to support the now legally defunct Redevelopment Plan, indicates that eighty-five percent of the residential properties in the Cramer Hill neighborhood are privately owned. Of the remaining fifteen percent, more than ten percent are owned by the City, either directly or through the Board of Education. The report further notes that of a total of 2,623 privately own residential properties, 142 were rated in "Good" condition, and 1,564 were rated in *66 "Fair condition."[1] The authors of the study further qualified these numbers by inserting the following disclaimer:
Superficial: Observations were of building exteriors only; it was not possible to observe the condition of buildings' interiors and rears.

Subjective: Even among design professionals (architects, planners and engineers), there is expected to be some variation of opinion regarding the assessments of property conditions. This subjectively applies all the more when the observers are not trained to assess property conditions in terms of their structural and cosmetic needs or investments.

Mutable: Whether they improve or decline, property conditions change over time. The purpose of this assessment is to capture appearances in this point in time, a "snapshot" of conditions, as it were.
[(Emphasis added).]
With these facts as background, we will now address the issues raised by the parties.

II
Plaintiffs argue that the trial court erred by ruling that the FHA, through N.J.S.A. 52:27D-325, authorized the City to use eminent domain to acquire the properties described in the challenged ordinance, without first filing a substantive certification application with COAH, as required by N.J.S.A. 52:27D-313. We disagree with plaintiffs' argument.
The FHA, N.J.S.A. 52:27D-301 to -329, was enacted to implement the Mount Laurel doctrine.[2] In its findings, the Legislature stated in part:
b. In the second Mount Laurel ruling, the Supreme Court stated that the determination of the methods for satisfying this constitutional obligation "is better left to the Legislature," that the court has "always preferred legislative to judicial action in their field," and that the judicial role in upholding the Mount Laurel doctrine "could decrease as a result of legislative and executive action."
c. The interest of all citizens, including low and moderate income families in need of affordable housing would be best served by a comprehensive planning and implementation response to this constitutional obligation.
. . . .
g. Since the urban areas are vitally important to the State, construction, conversion and rehabilitation of housing in our urban centers should be encouraged. However, the provision of housing in urban areas must be balanced with the need to provide housing throughout the State for the free mobility of citizens.
[N.J.S.A. 52:27D-302.]
The FHA established COAH "to provide an administrative mechanism for implementing the Mount Laurel doctrine." In re Adoption of N.J.A.C. 5:94, 390 N.J.Super. 1, 21, 914 A.2d 348 (App.Div.), certif. denied, 192 N.J. 71, 926 A.2d 856 (2007). The duties of COAH include: (1) determining the "housing regions of the State;" *67 (2) estimating "the present and prospective need for low and moderate income housing at the State and regional levels;" and (3) adopting criteria and guidelines for determination of municipal "present and prospective share of the housing need in a given region." N.J.S.A. 52:27D-307. The FHA also provides that:
a. Within four months after the effective date of this act, each municipality which so elects shall, by a duly adopted resolution of participation, notify the council of its intent to the submit to the council its fair share housing plan. Within five months after the council's adoption of its criteria and guidelines, the municipality shall prepare and file with the council a housing element, based on the council's criteria and guidelines, and any fair share housing ordinance introduced and given first reading and second reading in a hearing pursuant to R.S. 40:49-2 which implements the housing element.
[N.J.S.A. 52:27D-309(a) (emphasis added).]
Within two years of filing their housing element, a municipality "may . . . petition the council for a substantive certification of its element and ordinances or institute an action for declaratory judgment granting it repose in the Superior Court. . . ." N.J.S.A. 52:27D-313 (emphasis added).
Although participation in the process is voluntary, COAH's grant of substantive certification plays a "critically important role" because it "effectively insulates a municipality from exclusionary zoning litigation" for the term of the certification, up to a maximum of ten years. In re Twp. of Southampton, 338 N.J.Super. 103, 113, 768 A.2d 233 (App.Div.), certif. denied, 169 N.J. 610, 782 A.2d 428 (2001); see N.J.S.A. 52:27D-313. Under the FHA, COAH may grant substantive certification only if the municipality's fair share plan is consistent with COAH's rules and criteria and makes achievement of the municipality's fair share realistically possible. In re Twp. of Southampton, supra, 338 N.J.Super. at 113, 768 A.2d 233 (citing N.J.S.A. 52:27D-314).
Here, it is undisputed that the City did not seek substantive certification under N.J.S.A. 52:27D-313. Nor did the City pursue the alternate approach mentioned in N.J.S.A. 52:27D-313, whereby the City could have sought a judgment of repose from the Superior Court. Rather, the City sought to proceed under the authority given in N.J.S.A. 52:27D-325, which provides that:
Notwithstanding any other law to the contrary, a municipality may purchase, lease or acquire by gift or through the exercise of eminent domain, real property and any estate or interest therein, which the municipal governing body determines necessary or useful for the construction or rehabilitation of low and moderate income housing or conversion to low and moderate income housing. The municipality may provide for the acquisition, construction and maintenance of buildings, structures or other improvements necessary or useful for the provision of low and moderate income housing, and may provide for the reconstruction, conversion or rehabilitation of those improvements in such manner as may be necessary or useful for those purposes.
This statute's legislative history provides vital insight into its intended purpose. As originally enacted in 1985, section 325 did not include the language authorizing the use of eminent domain as a means to acquire property for low and moderate income housing. In 1990, the Legislature amended the statute to reflect its current form, partly in response to the unpublished decision of *68 Township of Denville v. McGreevey, No. MRSL 2402-88E (Law Div. August 26, 1988), in which the court denied Denville Township the right to acquire by eminent domain a 45-acre tract of land that was part of a fair-housing plan to produce 388 units of low and moderate income housing. Assembly Housing Committee Statement to A. 211 (enacted as L. 1990, c. 109).
The Legislature explained that although the bill to enact the FHA originally allowed for condemnation, the Legislature agreed with the Governor's recommendation to withhold the "drastic power" of condemnation unless it was shown to be necessary. The amendment came after the Denville case provided "[e]vidence of such necessity. . . ." Ibid. Thus, "this bill would restore to the `Fair Housing Act' the authority for a municipality to acquire property through condemnation in order to attain its `fair share' of affordable housing as determined pursuant to the act." Ibid. (emphasis added). The history of this legislation also includes the following statement from the Senate State Government and Federal and Interstate Relations Committee:
This bill amends the "Fair Housing Act," P.L.1985, c. 222 (C.52:27D-301 et al.) to specify that a municipality has the power to acquire real property through the exercise of eminent domain when its governing body determines that such property is necessary or useful for the provision of low and moderate income housing.
[Senate State Government and Federal and Interstate Relations Committee Statement to A. 211 (enacted as L. 1990, c. 109).]
Notwithstanding the Senate Committee's statement, plaintiffs argue that the highlighted language in the Assembly Housing Committee Statement is critical to understanding the true intent of the amendment; that is to require municipalities to first obtain a COAH substantive certification under N.J.S.A. 52:27D-313, as a prima facie showing that the power of eminent domain is being exercised consistent with the constitutional mandate underpinning the FHA.
The judicial starting point in statutory interpretation is always the plain language of the statute. DKM Residential Props. Corp. v. Twp. of Montgomery, 182 N.J. 296, 305, 865 A.2d 649 (2005). "As a general rule, `[a] statute should be interpreted in accordance with its plain meaning if it is clear and unambiguous on its face and admits of only one interpretation.'" Carpenter Tech. Corp. v. Admiral Ins. Co., 172 N.J. 504, 512, 800 A.2d 54 (2002) (quoting Franklin Tower One v. N.M., 157 N.J. 602, 613, 725 A.2d 1104 (1999)). If the plain language of the statute allows for the possibility of different meanings, then the court must seek to give effect to the legislative intent in light of the statute's language and context. Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 170-71, 892 A.2d 1240 (2006). To ascertain that intent, a court may turn to "the statute's structure, history, and purpose." In re Adoption of N.J.A.C. 71I, 291 N.J.Super. 183, 191, 677 A.2d 218 (App.Div.1996), aff'd, 149 N.J. 119, 693 A.2d 97 (1997).
These tools of construction, however, do not authorize a reviewing court to "rewrite a plainly-written enactment of the Legislature nor presume that the Legislature intended something other than that expressed by way of the plain language." O'Connell v. State, 171 N.J. 484, 488, 795 A.2d 857 (2002). In the process of interpretation, a court is not licensed to "`write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment,' Craster v. Bd. of Comm'rs of Newark, 9 N.J. 225, 230, 87 A.2d 721 (1952), or `engage in conjecture *69 or surmise which will circumvent the plain meaning of the act,' In re Closing of Jamesburg High School, 83 N.J. 540, 548, 416 A.2d 896 (1980)." DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005).
With these principles in mind, we are satisfied that the only limitation imposed on a municipality under the plain language of N.J.S.A. 52:27D-325, is that the power of eminent domain must be used for acquiring property "which the municipal governing body determines necessary or useful for the construction or rehabilitation of low and moderate income housing. . . ." Ibid. Had the Legislature intended any other restriction, including compliance with the certification process in N.J.S.A. 52:27D-313, it could have easily inserted language asserting that restriction.
The absence of any such limiting language negates the need to look for meaning within the legislative history and cannot simply be considered "legislative inadvertence." Deland v. Twp. of Berkeley Heights, 361 N.J.Super. 1, 14, 824 A.2d 185 (App.Div.) (interpreting an amendment to the FHA, which, pursuant to N.J.S.A. 52:27D-311(g), allowed a municipality that had received substantive certification from COAH and satisfied its affordable housing obligations to amend its compliance plan and zoning ordinances without the necessity of seeking additional approval from COAH), certif. denied, 179 N.J. 185, 843 A.2d 1152 (2003).

III
Plaintiffs also argue that the ordinance's proposed land acquisition scheme will actually reduce the number of affordable housing units in the City, thus contravening the expressed public policy rationale in N.J.S.A. 52:27D-325. Specifically, plaintiffs assert that "[t]he current proposal is to acquire and demolish 43 occupied homes at these four sites, and then build some unknown number of units of `low and moderate income housing.'"
In response, the City argues that neither the FHA nor its legislative history contains a qualification that "a municipality cannot use its power of eminent domain under § 325 if the project will decrease the supply of affordable housing." Thus, according to the City, even if plaintiffs' allegations are true, such an outcome would not render the ordinance invalid.
The trial court did not specifically address whether demolition of the units as set forth in the ordinance would increase or decrease the number of affordable housing units in the City. The ordinance does not specify the number of affordable housing units to be developed if the City proceeds with acquisition, by condemnation or otherwise, in all of the intended locations. In its statement of material facts presented to the trial court, the City asserted that it intends to build 162 units of affordable housing on sites E and F. Defendant Primas certified that sites E and F contain twenty-eight properties, only eleven of which were occupied residential buildings. These statements of intent lie outside the four corners of the ordinance, rendering their potential enforceability questionable.
Against this background, plaintiffs' argument requires us to determine the role of the court in reviewing municipal action taken under the expressed grant of authority in a statute adopted to fulfill the constitutional mandate of the Mount Laurel doctrine.
As with all acts of duly elected legislative bodies, municipal "ordinances are presumed valid and reasonable." Quick Chek Food Stores v. Springfield Twp., 83 N.J. 438, 447, 416 A.2d 840 (1980). *70 "The burden of proof to establish that they are arbitrary and unreasonable rests on the party seeking to overturn them." Ibid. "The presumption may be overcome only by a clear showing that the local ordinance is arbitrary or unreasonable." Hudson Circle Servicenter, Inc. v. Kearny, 70 N.J. 289, 298-99, 359 A.2d 862 (1976). "The underlying policy and wisdom of ordinances are the responsibility of the governing body, and if any state of facts may reasonably be conceived to justify the ordinance, it will not be set aside." Quick Chek Food Stores, supra, 83 N.J. at 447, 416 A.2d 840 (internal citations omitted).
We hold, however, that in reviewing ordinances adopted by a municipality under the authority granted to it by the FHA, (such as N.J.S.A. 52:27D-325), a court must determine whether such legislation is consistent with, and in furtherance of, the overarching constitutional mandate of the Mount Laurel doctrine; (requiring a municipality's land use regulations provide a realistic opportunity for low and moderate income housing). In reaching this conclusion, we emphasize that the FHA was expressly adopted by the Legislature to fulfill its constitutional obligation under Mount Laurel. N.J.S.A. 52:27D-302.
The guiding standard to be used in the exercise of this judicial oversight function was recently reaffirmed by our Supreme Court in Gallenthin Realty Development, Inc., v. Borough of Paulsboro, 191 N.J. 344, 924 A.2d 447 (2007). In Gallenthin, the Court was required "to ascertain the meaning of the term `blighted' as used in the New Jersey Constitution, and determine whether Paulsboro's interpretation of N.J.S.A. 40A:12a-5(e) is within the scope of that term." Id. at 358, 924 A.2d 447.
In its analysis of this issue, the Gallenthin Court noted that the Constitution's "Blighted Area Clause" enlarges the Legislature's eminent domain power to include the taking of private property for redevelopment purposes. Id. at 358, 924 A.2d 447. The statute in question here has a similar effect. By its plain language, N.J.S.A. 52:27D-325 "enlarges" a municipality's power to take private property by eminent domain. The only check on the exercise of that enhanced power is the statute's expressed predicate that the taking be "necessary or useful for the construction or rehabilitation of low or moderate income housing."
Here, confronted with plaintiffs' challenge, the trial court should have conducted an evidentiary hearing to determine whether the City's implementation plans are reasonably likely to fulfill the ordinance's expressed purpose. Stated differently, the court must determine whether there is a rational basis to sustain the municipal determination authorizing the use of eminent domain, as a means of fulfilling the constitutional mandate to provide low and moderate income housing.
In Gallenthin, the Court reviewed the Blighted Areas Clause, an expressed constitutional provision, N.J. Const. art VIII, § 3, ¶ 1, in the context of interpreting N.J.S.A. 40A:12a-5(e). Ibid. Here, we review municipal legislation pursuant to a statutory grant of authority, intended to fulfill an implied, yet now well-settled part of our State Constitution: the Mount Laurel doctrine. Thus, the role of the courts in reviewing governmental action in both of these contexts is the same. As Chief Justice Zazzali reminded us in Gallenthin:
[T]he Judiciary is the final arbiter of the institutional commissions articulated in the Constitution, see Sherman v. Citibank, 143 N.J. 35, 58, 668 A.2d 1036 (1995) ("It is emphatically the province and duty of the judicial department to say what the law is.") (quoting Marbury *71 v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60, 71 (1803)), vacated on other grounds, 517 U.S. 1241, 116 S.Ct. 2493, 135 L.Ed.2d 186 (1996). Our Constitution makes clear that "[a]ll political power is inherent in the people" and that "[g]overnment is instituted for the protection, security and benefit of the people." N.J. Const. art. I, P 2. By adopting the Blighted Areas Clause, the People entrusted certain powers to the Legislature, and the courts are responsible for ensuring that the terms of that trust are honored and enforced. We find no merit to Paulsboro's assertion that the Blighted Areas Clause divests the Judiciary of that responsibility.
[Id. at 358-59, 924 A.2d 447.]
Here, we have a similar responsibility. The municipal action here is subject to the same judicial scrutiny the Supreme Court conducted in Gallenthin. Our function is to ensure that the constitutional mandate of the Mount Laurel doctrine is not undermined by municipal action that, although taken in its name, may fall wide of the mark of actually fulfilling its purpose.
The people entrust the government with the power of eminent domain, with the expectation that it will be used sparingly, and in furtherance of a public good. The court's function is to ensure that this power is used consistent with and in furtherance of a clearly defined public good. Here, that public good is the creation of low and moderate income housing. The ordinance at issue professes to respond to that public good; yet the City has not offered evidence that this is in fact the case.
To pass constitutional scrutiny, the municipal action taken under the authority of section 325 must be supported by a well-developed record from which a reviewing court can find a rational nexus between the exercise of the power of eminent domain, and an increase in the number of affordable housing units. The City's mere, unsupported assertion in the body of the ordinance, that its governing body has determined that the exercise of eminent domain here is "necessary or useful" is insufficient.
As the parties challenging the ordinance, plaintiffs carry the burden of proving that this legislation is arbitrary and capricious because it does not do what it claims to do. That is, the taking by eminent domain of the Cramer Hill lots identified in the ordinance is not "necessary or useful" to the construction of low and moderate income housing in the City.
Reversed and remanded. We do not retain jurisdiction.
NOTES
[1] The study defined "Good" to mean "[n]ew/well maintained structures in need of minor cosmetic improvement." "Fair" is defined as "[s]tructures in need of minor non-structural rehab improvements."
[2] S. Burlington County NAACP v. Mount Laurel, 67 N.J. 151, 336 A.2d 713, appeal dismissed and cert. denied, 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975), and S. Burlington County NAACP v. Mount Laurel, 92 N.J. 158, 456 A.2d 390 (1983).