131 A.3d 961

IN THE MATTER OF THE ADOPTION OF THE HOUSING ELE-
MENT FOR THE TOWNSHIP OF MONROE AND THE FAIR
SHARE PLAN AND IMPLEMENTING ORDINANCES. IN THE
MATTER OF THE ADOPTION OF THE HOUSING ELEMENTS
FOR THE TOWNSHIP OF SOUTH BRUNSWICK AND THE
FAIR SHARE PLAN AND IMPLEMENTING ORDINANCES. IN
THE MATTER OF THE ADOPTION OF THE HOUSING ELE-
MENTS FOR THE TOWNSHIP OF EDISON AND THE FAIR
SHARE PLAN AND IMPLEMENTING ORDINANCES. IN THE
MATTER OF THE ADOPTION OF THE HOUSING ELEMENTS
FOR THE BOROUGH OF SOUTH PLAINFIELD AND THE FAIR
SHARE PLAN AND IMPLEMENTING ORDINANCES. IN THE
MATTER OF THE ADOPTION OF THE HOUSING ELEMENTS
FOR THE TOWNSHIP OF OLD BRIDGE AND THE FAIR
SHARE PLAN AND IMPLEMENTING ORDINANCES. IN THE
MATTER OF THE ADOPTION OF THE HOUSING ELEMENTS
FOR THE TOWNSHIP OF PLAINSBORO AND THE FAIR
SHARE PLAN AND IMPLEMENTING ORDINANCES. IN THE
MATTER OF THE ADOPTION OF THE HOUSING ELEMENTS
FOR THE BOROUGH OF SAYREVILLE AND THE FAIR
SHARE PLAN AND IMPLEMENTING ORDINANCES. IN THE
MATTER OF THE ADOPTION OF THE HOUSING ELEMENTS
FOR THE TOWNSHIP OF EAST BRUNSWICK AND THE FAIR
SHARE PLAN AND IMPLEMENTING ORDINANCES.

Superior Court of New Jersey
Law Division Middlesex County

Decided October 5, 2015.

*Marguerite Schaffer (Shain, Schaffer & Rafanello, P.C.,* attorneys), and *Jerome Convery* for the Township of Monroe.

*Donald J. Sears* for the Township of South Brunswick.

*Leslie G. London* for the Township of Edison (*McManimon Scotland & Baumann*, attorneys).

*Steven A. Kunzman* for the Township of East Brunswick, the Township of Old Bridge, and the Borough of South Plainfield (*DiFrancesco Bateman, Kunzman, Davis, Lehrer & Flaum, P.C.*, attorneys).

*Michael W. Herbert* of the Township of Plainsboro (*Herbert, Van Ness Cayci & Goodell, P.C.*, attorneys).

*Lawrence B. Sachs* for the Borough of Sayreville.

*Stephen M. Eisdorfer* and *Thomas F. Carroll, III* for Intervenor Monroe 33 Developers LLC (*Hill Wallack LLP*, attorneys).

*Kenneth D. McPherson, Jr.* for Intervenor South Brunswick Center, LLC (*Waters, McPherson, McNeill, P.C.*, attorneys).

*Robert A. Kasuba* for Intervenor Tices Developers, LLC (*Bisgaier Hoff*, attorneys).

*Kevin D. Walsh* and *Adam Gordon* for Intervenor Fair Share Housing Center, Inc.

*Henry Kent–Smith* for Intervenor Richardson Fresh Ponds and Princeton Orchard Associates (*Fox, Rothschild*, attorneys).

WOLFSON, J.S.C.

I.   Statement Of The Case

Following the Supreme Court's decision in *In re Adoption of N.J.A.C. 5:96 and 5:97 by N.J. Council on Affordable Housing*, 221 *N.J.* 1, 110 *A.*3d 31 (2015), (hereinafter *"Mount Laurel IV"*), several municipalities moved before this court for a declaration that their respective fair share numbers should be capped at 1000 units in accordance with the Fair Housing Act ("FHA") and with existing regulations of the Council on Affordable Housing ("COAH"). *See N.J.S.A.* 52:27D–307(e); *N.J.A.C.* 5:97–5.8.[1]

---

[1] These municipalities include the following: Monroe; South Brunswick; East Brunswick; Old Bridge; Plainsboro; Edison; South Plainfield; and Sayreville

Consequently, the novel issues to be adjudicated here concern: (1) the availability, applicability, and manner of implementation of the "1000–unit cap" as to each municipality's respective Third Round obligations; (2) whether and to what extent those obligations must address, in the aggregate, both the unmet need for lower income housing that had been generated between 1999 and today (the "gap period"), as well as their fair share of the region's prospective need for such housing as calculated from today through 2025; and (3) how credits for affordable units constructed during those prior cycles shall be applied.

## II. Relevant History Of The 1000–Unit Cap

In response to *Southern Burlington County NAACP v. Township of Mount Laurel*, 67 *N.J.* 151, 336 *A.*2d 713 (1975) (hereinafter *"Mount Laurel I "*) and *Southern Burlington County NAACP v. Township of Mount Laurel*, 92 *N.J.* 158, 456 *A.*2d 390 (1983) (hereinafter *"Mount Laurel II "*), the Legislature enacted the FHA, which created COAH. That administrative agency was empowered to "define housing regions within the state and the regional need for low and moderate income housing, along with the power to promulgate criteria and guidelines to enable municipalities within each region to determine their fair share of that regional need." *Hills Dev. Co. v. Bernards*, 103 *N.J.* 1, 20, 510 *A.*2d 621 (1986) (hereinafter *"Mount Laurel III "*); see *N.J.S.A.* 52:27D–305 (establishing COAH). In addition, the Legislature bestowed upon COAH, instead of the courts, the power "to decide whether proposed ordinances and related measures of a particular municipality will, if enacted, satisfy its *Mount Laurel* obligation," thereby embracing and codifying a municipality's constitutional obligation to provide a realistic opportunity for the construction of

---

(collectively, the "Municipalities"). Each of these municipalities has pending, separate declaratory judgment actions seeking declarations that their respective housing elements and fair share plans are constitutionally compliant. For purposes of efficiency, I have consolidated these cases for oral argument only, and have allowed interested parties to file briefs and supplemental briefs and also participate in the oral argument.

its fair share housing for lower and moderate income households. *Mount Laurel III, supra,* 103 *N.J.* at 20, 510 *A.*2d 621; *see also Sod Farm Assocs. v. Twp. of Springfield,* 366 *N.J.Super.* 116, 123, 840 *A.*2d 885 (App.Div.2004) (COAH established "as an alternative method of review to be used by municipalities for challenges, review of zoning regulations and for protection from future challenges").

In a concerted effort calculated to protect municipalities from onerous fair share burdens that could cause a "radical transformation" of the municipality, *(see Mt. Laurel II, supra,* 92 *N.J.* at 219, 456 *A.*2d 390 (where the construction of the requisite housing would "radically transform the municipality overnight," trial courts were authorized to relieve a municipality of its duty to satisfy its obligation immediately)), the Legislature directed COAH to adopt guidelines that would "adjust" the present and prospective fair share if "[t]he established pattern of development in the community would be drastically altered." *N.J.S.A.* 52:27D–307(c)(2)(b). Pursuant to *N.J.S.A.* 52:27D–307(e), COAH was authorized in its discretion to

place a limit, based on a percentage of existing housing stock in a municipality and any other criteria including employment opportunities which the council deems appropriate, upon the aggregate number of units which may be allocated to a municipality as its fair share of the region's present and prospective need for low and moderate income housing.

Consistent with this directive, COAH enacted *N.J.A.C.* 5:92–7.1, which provided:

(a) After receiving the crediting provided in Subchapter 6, Credits, where a municipality's present and prospective fair share exceeds 20 percent of its total occupied housing stock as estimated as of July 1, 1987, the municipality may adjust its fair share to 20 percent of its estimated 1987 occupied housing stock.

(b) After receiving the crediting provided in *N.J.A.C.* 5:92–6, Credits, where a municipality's present and prospective fair share exceeds 1,000 low and moderate income housing units, the municipality may adjust its fair share to 1,000.

Three years after these regulations were promulgated, the Appellate Division invalidated them. *See Calton Homes, Inc. v. Council on Affordable Hous.,* 244 *N.J.Super.* 438, 450, 582 *A.*2d 1024 (App.Div.1990), (COAH's determination that a fair share number exceeding 1000 per se constitutes a drastic alteration of

the established pattern of development in all New Jersey municipalities deemed arbitrary and unreasonable), *certif. denied,* 127 *N.J.* 326, 604 *A.*2d 601 (1991). Because a per se cap did not properly account for the fact that "certain municipalities may have a fair share obligation more than double the 1,000–unit cap," the Appellate Division predicted that a substantial fair share disparity might well arise among municipalities within the same housing region, *id.* at 450–451, 582 *A.*2d 1024, prompting it to remark that the Legislature "could not have intended to convey unbridled discretion to select an absolute cap on the number of units to be built without first considering the burden imposed on the petitioning municipality and its relationship to other municipalities sharing the burden of providing regional and statewide housing needs." *Id.* at 448, 582 *A.*2d 1024.

The Legislature quickly responded to the *Calton Homes* decision by adopting an amendment to the FHA designed to cure the deficiencies adjudicated to exist in the prior version. *See Sponsor's Statement to S. 858* (1993) ("[t]he courts declared the regulation illegal because it imposed a cap that was not based upon the facts and circumstances of the municipality").

As amended, *N.J.S.A.* 52:27D–307(e) provides, in pertinent part:

No municipality shall be required to address a fair share of housing units ... beyond 1,000 units within six years from the grant of substantive certification, unless it is demonstrated, following objection by an interested party and an evidentiary hearing, based upon the facts and circumstances of the affected municipality that it is likely that the municipality through its zoning powers could create a realistic opportunity for more than 1,000 low and moderate income units within that six-year period.

Instead of a "per se" 1000–unit cap, the Legislature "add[ed] criteria correlating a 1,000 unit cap with a municipality's capacity to absorb a substantial amount of affordable housing." *In re Application of Twp. of Jackson,* 350 *N.J.Super.* 369, 373, 795 *A.*2d 318 (App.Div.2002).

Among "the facts and circumstances which shall determine whether a municipality's fair share shall exceed 1,000 units ... shall be a finding that the municipality has issued more than 5,000

certificates of occupancy for residential units in the six-year period preceding the petition for substantive certification." *N.J.S.A.* 52:27D–307(e).

In accordance with its administrative authority, COAH promulgated *N.J.A.C.* 5:93–14.1, which directly paralleled § 307(e) of the FHA:

> No municipality shall be required to address a fair share beyond 1,000 units within six years from the grant of substantive certification, unless it is demonstrated, following an objection and an evidentiary hearing, based upon the facts and circumstances of the affected municipality that it is likely that the municipality through its zoning powers could create a realistic opportunity for more than 1,000 low and moderate income units within the six year period. The facts and circumstances which shall determine whether a municipality's fair share shall exceed 1,000 units shall be a finding that the municipality has issued more than 5,000 certificates of occupancy for residential units in the six year period preceding the petition for substantive certification.

COAH's determination that the 1000–unit cap applied to "calculated" and not "pre-credited" need, was upheld in *Jackson, supra,* 350 *N.J.Super.* at 375–76, 795 *A.*2d 318. According to the COAH regulations, "pre-credited need" is defined as "the municipal low and moderate income housing obligation resulting from subtracting filtering, residential conversion and spontaneous rehabilitation from the sum of indigenous need, reallocated present need, prior cycle prospective, prospective need and demolitions." *N.J.A.C.* 5:93–1.3. "Calculated need" is defined as "the result of subtracting adjustments, reductions, credits, bonuses, prior cycle credits and the 20 percent cap from the precredited need. To the extent that the Council has knowledge of prior cycle credits and eligible reductions, these credits and reductions have been applied to the municipal housing obligation." *Ibid.*

In 2002, the Legislature increased the "certification" period from six to ten years, but the Legislature did not otherwise alter § 307(e) of the FHA. *See N.J.S.A.* 52:27D–307(e); *see also Sponsor's Statement to S.* 1319 (2000) ("This bill would increase from six to ten years the certification period under" the FHA). Consistent with that amendment, COAH promulgated *N.J.A.C.* 5:97–5.8, which provides:

(a) No municipality shall be required to plan for a projected growth share obligation beyond 1,000 units within 10 years from the grant of substantive certification, unless it is demonstrated, following an objection and an evidentiary hearing, based upon the facts and circumstances of the affected municipality, that it is likely that the municipality through its zoning powers could create a realistic opportunity for more than 1,000 low- and moderate-income units within the 10-year period. The facts and circumstances which shall determine whether a municipality's projected growth share shall exceed 1,000 units shall be a finding that the municipality has issued more than 5,000 certificates of occupancy for residential units in the 10-year period preceding the petition for substantive certification.

III. Application of the 1000–Unit Cap to Third Round Compliance

Because COAH failed to adopt its Third Round rules by 1999, it has been left to the designated trial courts to address the manner and method by which a municipality's fair share obligation shall be addressed, including, for example, how the 1000–unit cap should be applied going forward. *Mount Laurel IV, supra,* 221 *N.J.* at 5, 110 *A.*3d 31; *see also In re Adoption of N.J.A.C. 5.96 and 5.97,* 416 *N.J.Super.* 462, 473, 6 *A.*3d 445 (App.Div.2010) (requiring the court to determine the legislative intent and purpose); *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005) ("The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language"). The court must "ascribe to the statutory words their ordinary meaning and significance," *ibid.* and must be "guided by the legislative objectives sought to be achieved by the statute." *Shelton v. Restaurant.com, Inc.,* 214 *N.J.* 419, 429, 70 *A.*3d 544 (2013). In doing so, two vastly disparate legislative interests must be weighed: first, insuring that municipalities meet their constitutional obligations to provide their fair share of affordable housing on the one hand, and second, sensitivity to, and recognition of the reality that the imposition of a large or onerous municipal housing obligation in a relatively short time span may well cause a "sudden and radical transformation" in many municipalities, on the other. *See N.J.S.A.* 52:27D–307(e); *N.J.A.C.* 5:97–5.8; *see also Mount Laurel II, supra,* 92 *N.J.* at 280, 456 *A.*2d 390.

In this regard, the municipalities maintain that the FHA's and COAH's implementing regulations are clear and unambiguous, and based thereon, if their Third Round fair share obligation *is greater than* 1000 units, then they are statutorily "entitled" to have their respective fair share obligations limited to 1000 units over the ten-year period following their anticipated judgments of compliance. In contrast, the Intervenors argue that had COAH functioned as intended, Third Round rules would have been adopted in 1999, Fourth Round rules would have been adopted in 2009, and Fifth Round rules would be adopted in 2019. Assuming that the 1000–unit cap was applicable during those time periods and that COAH had granted substantive certification for each of those rounds, Intervenors contend that the "cap" would have been aggregated and would have been 2600 units, because the true compliance period for these declaratory judgment actions is actually twenty-six years (from 1999 to 2025), and not the single ten-year period going forward from the anticipated 2015 judgment of compliance. To conclude otherwise, they urge, would result in an unconstitutional "dilution" of the actual affordable housing need, contrary to the mandates of the *Mount Laurel* decisions.

In striving to resolve this controversy and to achieve an equitable and lawful result, it is not the job of the trial court to become a "replacement agency for COAH." *Mount Laurel IV, supra,* 221 *N.J.* at 29, 110 *A.*3d 31. Nevertheless, in the absence of a current administrative format within which to operate, the Supreme Court in *Mount Laurel IV* has suggested that the designated *Mount Laurel* trial judges "track" the processes provided for in the FHA "as closely as possible," so as to create "a system of coordinated administrative and court actions." *Ibid.* In doing so, it is helpful to examine COAH's past practices and regulatory framework (both as enacted and proposed) as well as the Supreme Court's treatment of these issues in an effort to glean some assistance, insights and guidance in crafting a workable construct that tracks "as closely as possible" the probable manner in which COAH, if tasked to do so today, would address these competing concerns and policies. *Id.* at 6, 110 *A.*3d 31.

In pertinent part, *N.J.S.A.* 52:27D–307(e) states, "No municipality shall be required to address a fair share of housing units affordable to households with a gross household income of less than 80% of the median gross household income beyond 1,000 units within ten years from the grant of substantive certification." Unquestionably, the Legislature intended the 1000–unit cap to be applied to a single ten-year compliance period. What the Legislature could not have foreseen was that COAH would cease to function, leaving the courts, literally, to fill the fifteen-year gap period from 1999 until today.

The constitutional obligation to provide affordable housing is a strong one, and has been a bedrock principle of our judicial fabric for nearly forty-five years, *see e.g., Oakwood at Madison, Inc. v. Madison Twp.*, 117 *N.J.Super.* 11, 283 *A.*2d 353 (Law Div.1971), and *Oakwood at Madison, Inc. v. Madison Twp.*, 128 *N.J.Super.* 438, 320 *A.*2d 223 (Law Div.1974), *modified,* 72 *N.J.* 481, 494, 371 *A.*2d 1192 (1977) ("[T]he basic rationale embraced by Judge Furman in both of his [trial court] opinions in the case is substantially that adopted by this court in *Mount Laurel*"), and has, likewise, been firmly embraced by our Legislature for nearly twenty years. Indeed, the Supreme Court only recently demonstrated the strength of its resolve to enforce this constitutional imperative in both *In re Adoption of N.J.A.C. 5:96*, 215 *N.J.* 578, 588, 74 *A.*3d 893 (2013) and *Mount Laurel IV, supra,* 221 *N.J.* at 3, 110 *A.*3d 31. However, balanced against this constitutional imperative is an equally strong sensitivity to, and interest historically exhibited by both the Legislature and the courts, that municipalities deserve protection from a sudden, dramatic influx of housing units (both affordable and market rate), which potentially could drastically alter the landscape of, and/or radically transform a given municipality. *See N.J.S.A.* 52:27D–307(e); *see also Mount Laurel II, supra,* 92 *N.J.* at 219, 456 *A.*2d 390.

Nonetheless, I cannot abide the result urged by the municipalities. Not only is it abundantly clear that the Legislature never intended the cap period to extend beyond one single ten-year

period, but a contrary interpretation would undoubtedly lead to an untenable and unconstitutional result, *see e.g., Calton Homes, supra,* 244 *N.J.Super.* at 460–461, 582 *A.*2d 1024, which should, where possible, be avoided. *See Schierstead v. Brigantine,* 29 *N.J.* 220, 230, 148 *A.*2d 591 (1959) (if reasonably possible, statutes should be accorded a construction that is sensible and consonant with reason and good discretion, rather than one that leads to absurd consequences); *see also State Farm Mut. Auto. Ins. Co. v. State,* 124 *N.J.* 32, 61, 590 *A.*2d 191 (1991) (courts should avoid interpretation of a statute that would render it unconstitutional).

While the municipalities before me may well be blameless for COAH's inaction, the well-documented failures of that Agency neither relieved nor absolved these towns from fulfilling (or at least attempting to fulfill) their respective fair share responsibilities. Regrettably, these constitutional obligations have been accumulating for the past sixteen years with little evidence of significant statewide compliance. Interpreting the FHA and COAH regulations so as to ignore that unmet need would be squarely at odds with the Constitution and the Legislature's overarching intent to produce affordable housing. *See In re Adoption of N.J.A.C. 5:96, supra,* 215 *N.J.* at 588, 74 *A.*3d 893 (the main purpose of the FHA and the *Mount Laurel* decisions is to fulfill a constitutional, moral, and general welfare obligation to provide housing to the less fortunate in our society); *see also Calton Homes, supra,* 244 *N.J.Super.* at 460–461, 582 *A.*2d 1024 (cautioning that, in some instances, the 1000–unit cap may result in a dilutionary effect, which could, itself, unconstitutionally interfere with the FHA's overall purpose).

IV. Implementing Outstanding Fair Share Housing Obligations

Notwithstanding the inevitable conclusion that the municipal fair share obligation must, in some fashion, include the unmet need that accumulated during the prior sixteen-year gap period, I must, if possible, give effect to the competing legislative and judicial concerns and cautions to avoid drastically altering the

landscape and/or causing a radical transformation by allowing an excessively onerous or burdensome influx of housing *(see Sponsor's Statement to S. 858* (1993) (stating that COAH intended "to avoid the imposition of onerous burdens on municipalities by adopting a regulation capping the fair share of each municipality at 1000"); *see also Mount Laurel II, supra,* 92 *N.J.* at 219, 456 *A.*2d 390).

In striking an equitable balance between these competing imperatives and policies, it is appropriate to examine the Supreme Court's treatment of the "radical transformation" issue as well as COAH's own responses and conduct relative thereto. *See Mount Laurel IV, supra,* 221 *N.J.* at 29–30, 110 *A.*3d 31 (instructing that "certain guidelines can be gleaned from the past and can provide assistance to the designated *Mount Laurel* judges in the vicinages").

In *Mount Laurel II,* the Supreme Court indicated that courts were authorized to relieve a municipality of its duty to immediately satisfy its present need in a situation when the construction of the requisite housing would be "in such quantity as would radically transform the municipality overnight," *Mount Laurel II, supra,* 92 *N.J.* at 219, 456 *A.*2d 390, but cautioned that such relief was to be granted "sparingly." *Ibid.* The Appellate Division has, likewise, weighed in, concluding that under a "judicially supervised plan," when the danger of radical transformation exists, the " '[t]rial courts should have the discretion, under those circumstances, to moderate the impact of such housing by allowing the present need *to be phased in* over a period of years.' " *Calton Homes, supra,* 244 *N.J.Super.* at 449–50, 582 *A.*2d 1024 (quoting *Mount Laurel II, supra,* 92 *N.J.* at 219, 456 *A.*2d 390) (emphasis supplied).

On the regulatory front, before its demise, COAH was in the midst of considering a new substantive rule, *N.J.A.C.* 5:99. If adopted, *N.J.A.C.* 5:99 would have repealed 5:97 *(see 46 N.J.R.* 924 (Jun. 2, 2014)), and essentially, would have allowed participating Municipalities *to phase in* their "Unanswered Prior Obligation" over subsequent compliance cycles: "[m]unicipalities shall be gov-

erned by the standards in *N.J.A.C.* 5:93 to address Unanswered Prior Obligations but *shall not be required to address more than 50 percent* of the Unanswered Prior Obligation, except as constrained by the Positive Prior Cycle Buildable Limit column in chapter Appendix D." 46 *N.J.R.* 931 (June 2, 2014) (emphasis added).

Inasmuch as the proposed rule would have protected a municipality that sought substantive certification against being forced to provide for "more than 50 percent" of its prior round obligation, it is logical to infer that COAH contemplated that these units would not be ignored or lost, but rather, presumptively, would have been *phased in* and addressed, but in no less than two future rounds of compliance. *See* 46 *N.J.R.* 931 (Jun. 2, 2014) (municipalities are "not required to address more than 50 percent" during their current compliance cycle).

Even though *N.J.A.C.* 5:99 was never adopted by COAH, it does provide a window into the mindset of that Agency and demonstrates its concern that imposing a significant "Unanswered Prior Obligation" onto a municipality's prospective need number could result in a radical transformation of the municipality. Instead, as proposed, a municipality's prior unmet need would not disappear or be ignored, but rather, the impact of its inclusion would be softened, by phasing it in over at least two consecutive compliance cycles. Such a regulation would not facially offend the Constitution, inasmuch as the Supreme Court and Appellate Division have both concluded that a "phasing in" of the present need over time is appropriate where necessary to avoid a radical transformation. *See Mount Laurel II, supra,* 92 *N.J.* at 219, 456 *A.2d* 390; *Calton Homes, supra,* 244 *N.J.Super.* at 449–50, 582 *A.2d* 1024. Indeed, the trial courts were specifically authorized to "moderate the impact" of a burdensome or onerous influx of housing by allowing the accumulated unmet need to be phased in "over a period of years." *See Mount Laurel II, supra,* 92 *N.J.* at 219, 456 *A.2d* 390.

Likewise, in referencing those prior Appellate Division decisions upholding COAH's discretion in the rulemaking process, the Su-

preme Court has instructed that the designated Mount Laurel judges may "confidently" rely on those cases and utilize similar discretion when assessing a town's plan, when persuaded that the techniques proposed will promote a realistic opportunity for producing a town's fair share of affordable housing. *See Mount Laurel IV, supra,* 221 *N.J.* at 30, 110 *A.*3d 31.

So too, here, *N.J.S.A.* 52:27D–307(e) and *N.J.A.C.* 5:97–8 can be applied so as to give effect to the intent and dual purposes of both the Legislature and the Supreme Court—providing affordable housing *without any unnecessary dilution,* while at the same time, reducing the potential for a "radical transformation" through a "phasing in" of the housing need generated during the gap period over several consecutive cycles. Such an interpretation avoids an absurd, untenable, or unconstitutional result, and is entirely consistent with the discretion and flexibility expressly afforded the trial courts under *Mount Laurel IV, Mount Laurel II,* and *Calton Homes. See e.g., Mount Laurel IV, supra,* 221 *N.J.* at 33, 110 *A.*3d 31 (emphasizing the need for the courts to employ "flexibility" in assessing a town's constitutional compliance).

In order to effectuate these principles, those municipalities qualifying for the 1000–unit cap for the 2015–2025 period, shall be required to address the affordable housing need attributable to the gap period, but they will not be required to do so entirely during the first ten-year period following an adjudication of compliance. Instead, those units attributable to the gap period may be provided in three equal installments of the next ten-year cycles, starting with the ten-year period following their anticipated 2015 grant of compliance. The presumptive use of three consecutive cycle periods may be subject to a downward modification if a moving party demonstrates by clear and convincing evidence that a given municipality could reasonably create more units than the presumptive one-third of the aggregate need from the prior cycles, or can reasonably do so in fewer than three consecutive ten-year cycles, based upon sound environmental and planning principles,

as well as those "facts and circumstances" contemplated in *N.J.A.C.* 5:97–5.8. While a particular municipality with unique physical or environmental constraints, could, in good faith, seek to extend the presumptive three-cycle period within which to absorb its unmet prior obligations, given the likely constitutional challenge, and the questionable likelihood of success, the viability of such a request seems highly doubtful.

For any municipality that cannot qualify for the 1000–unit cap, there will be a presumption against phasing in its prior unmet need, which presumption may be overcome only if, by clear and convincing evidence, the "facts and circumstances" demonstrate that satisfying the entirety of its fair share obligation during the 2015–2025 cycle, would, based on sound environmental and planning principles, cause that municipality to undergo a radical transformation.

All municipal requests for credits, (whether "cap" eligible or not), shall be addressed in the manner authorized by COAH, as upheld by the Appellate Division in *Jackson, supra,* 350 *N.J.Super.* at 374–77, 795 *A.*2d 318, and implicitly sanctioned by the Supreme Court in *Mount Laurel IV, supra,* 221 *N.J.* at 30, 110 *A.*3d 31 (previous methodologies and aspects of COAH's rules found valid by the appellate courts may be utilized "confidently" by trial judges). Accordingly, all credits are to be applied first to the calculated need for the gap period (1999–2015), and if, after having applied these credits, excess credits still remain, they would be applied against a municipality's prospective need obligation covering the 2015 to 2025 cycle. *See Jackson, supra,* 350 *N.J.Super.* at 374–75, 795 *A.*2d 318. Any excess credits that were earned during prior rounds (1987–1999) or since 1999 are to be applied *first* to the sixteen-year gap period between 1999 and 2015, after which a municipality's affordable housing obligation would be capped at a maximum of 1600 units, and (if not exhausted), thereafter, against the prospective need obligation for the next ten-year cycle (2015–2025).

V.  Conclusion

For the reasons set forth above, I am satisfied that the accumulated need that developed during the gap period must be included as a component of a municipality's affordable housing obligation, but that allowing it to be phased in over this and future compliance cycles, where warranted by the "facts and circumstances," properly balances the laudatory public policies and constitutional interests promoted by, and embodied in, both the FHA and the *Mount Laurel* decisions.  Likewise it fairly reconciles these constitutional protections with the competing concerns of those municipalities, whether eligible for the 1000-unit cap or not, that their respective towns not be radically transformed "overnight," while tracking "as closely as possible," the intent and purposes of the FHA, COAH regulations, and the true spirit of the *Mount Laurel* decisions.

Intervenor Fair Share Housing Center shall submit an appropriate form of order, incorporating this opinion by reference under the five-day Rule. No costs.